

Villanova University School of Law Digital Repository

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-9-2008

# Norfolk Southern v. Basell USA

Precedential or Non-Precedential: Precedential

Docket No. 06-3425

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Norfolk Southern v. Basell USA" (2008). *2008 Decisions*. Paper 1654.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1654

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-3425
_____

NORFOLK SOUTHERN RAILWAY COMPANY,
Appellant

v.

BASELL USA INC.
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 05-cv-03419)
District Judge: Honorable Berle M. Schiller

_____

Argued September 10, 2007

Before: SCIRICA, Chief Judge,
RENDELL and FUENTES, Circuit Judges.

(Filed: January 9, 2008)

Paul D. Keenan   **[ARGUED]**
Charles L. Howard
Keenan, Cohen & Howard
One Pitcairn Place, Suite 2400
165 Township Line Road
Jenkintown, PA   19046
   *Counsel for Appellant*
   *Norfolk Southern Railway Company*


Nicholas J. DiMichael  **[ARGUED]**
Thomson Hine
1920 N Street, NW, Suite 800
Washington, DC   20036-1600

Conrad O. Kattner
John P. McShea, III
McShea & Tecce
Bell Atlantic Tower, 28th Floor
1717 Arch Street
Philadelphia, PA   19103
   *Counsel for Appellee*
   *Basell USA Inc.*

_____

OPINION OF THE COURT
_____

2

RENDELL, *Circuit Judge*.

Norfolk Southern Railway Co. ("Norfolk Southern") and its customer Basell USA Inc. ("Basell") agree that Basell breached a contract that existed between them. They disagree, however, as to whether the breach was material and whether it constituted a repudiation — either of which would have entitled Norfolk Southern to terminate the contract. On cross-summary judgment motions, the District Court held that Norfolk Southern did not have the right to terminate the contract, explicitly concluding that the breach was not material and implicitly ruling that there had been no repudiation. Norfolk Southern now appeals both of these aspects of the District Court's order. The District Court had jurisdiction pursuant to 28 U.S.C. § 1332 and we have jurisdiction pursuant to 28 U.S.C. § 1291. We will vacate the District Court's summary judgment order in part and remand for further proceedings consistent with this opinion.

## I.  Factual and Procedural History

Basell manufactures plastic pellets at a production facility in West Lake Charles, Louisiana, and contracts with others, including Norfolk Southern, to transport those pellets to customers throughout the United States. There is no single rail carrier that can offer freight transport all the way from the West Lake Charles facility to destinations in the eastern United States. The BNSF Railway Company ("BNSF") and the Union Pacific Railroad ("Union Pacific") both serve West Lake Charles, but

3

do not serve destinations in the eastern United States. Conversely, Norfolk Southern and CSX Transportation Company ("CSX") both serve destinations in the eastern United States, but do not serve West Lake Charles. Therefore, all rail deliveries to the eastern United States are by joint-line service, involving both an origin carrier and a destination carrier — either BNSF or Union Pacific transports the pellets from the West Lake Charles facility to a rail "interchange," where it hands off the railcars to either Norfolk Southern or CSX for the second leg of the trip.

This pellet-transport traffic divides into three categories:

- "Competitive rail direct": both Norfolk Southern *and* CSX are capable of transporting the pellets all the way from the rail interchange to the end customer by rail.

- "Captive rail direct": only Norfolk Southern *or* CSX is capable of transporting the pellets all the way from the rail interchange to the end customer by rail.

- "Truck terminal": the end customer either must receive, or prefers to receive, the pellet delivery by truck instead of by rail; either Norfolk Southern or CSX transports the pellets from the rail interchange to a terminal, where it then

4

transfers them to trucks for final delivery.

Norfolk Southern and Basell entered into a contract in early 2002 under which Norfolk Southern promised to charge Basell a rate below the published tariff rate in exchange for Basell's using Norfolk Southern for 95% of certain deliveries originating in West Lake Charles from February 2002 through May 2007.[1]   According to Basell, the minimum volume commitment was 95% of the aggregate deliveries — competitive rail direct, captive rail direct, and truck terminal — that Norfolk Southern was capable of making, excluding any truck deliveries where the end customer was more than 100 miles from the nearest Norfolk Southern truck-transfer terminal.  According to Norfolk Southern, the minimum volume commitment was 95% of the aggregate competitive and captive rail direct deliveries that it was capable of making, and also 95% of the truck deliveries where the end customer was less than 100 miles from the nearest Norfolk Southern truck-transfer terminal.[2]

Basell fulfilled its minimum volume commitment in

---

[1] Although the parties disagree slightly as to the type of traffic that was to be included in the formula, the discrepancy does not have a significant effect on our analysis because they agree that rail direct was included and the vast majority of the West Lake Charles traffic was rail direct.

[2] There is no final written contract.

2002, 2003, and 2004.  However, it fell short in 2005 when it entered into a contract obligating it to use CSX for shipments originating in West Lake Charles.  Basell's expert calculated that in 2005 Basell used Norfolk Southern to deliver 80% of the traffic covered by their contract, instead of the promised 95%. The 15% shortfall consisted entirely of rail direct traffic — captive and competitive — and not a single truck terminal delivery.

Norfolk Southern does not dispute the 80% figure, but emphasizes that, in breaching the contract, Basell provided it with only 55% of the *competitive* rail direct traffic, and that this number is the proper focus for determining the magnitude of the breach.  Norfolk Southern urges that it agreed to charge Basell discounted rates across the board — including for captive traffic — in order to secure the competitive traffic originating in West Lake Charles, for which Basell could have chosen to use either Norfolk Southern or CSX.  Since Basell would have received the *captive* traffic even without the contract, it maintains that the diverted *competitive* traffic is what is most relevant in evaluating the breach.

Basell entered into a two-year contract with CSX beginning in February 2005.  It is undisputed that compliance with its contractual obligations to CSX caused its failure to meet its minimum volume commitment to Norfolk Southern. Although the details of Basell's contract with CSX are not

6

clearly set forth in the record before us,[3] the parties agree that Basell promised to use CSX as the destination carrier for 95% of a pool of deliveries that overlapped somewhat with the pool of West Lake Charles deliveries covered by Basell's contract with Norfolk Southern. In order to fulfill its minimum volume commitment to CSX, Basell diverted to CSX competitive rail direct traffic for which it was already contractually bound to use Norfolk Southern.

The procedural history of the case as it progressed in the District Court is somewhat complex, with a variety of claims and counterclaims asserted along the way. Originally, Norfolk Southern sued for (1) a declaratory judgment that Basell should have been paying the tariff rate for *all* transport services that Norfolk Southern had provided it since June 2002, which included deliveries originating in West Lake Charles and three other Basell pellet-production facilities, and (2) money damages for Basell's failure to pay the tariff rate. Norfolk Southern then amended its complaint to add a claim for breach of contract. Basell filed counterclaims for a declaratory judgment in its favor, quantum meruit, unfair competition, and tortious interference with existing and prospective contractual relations. It appears from the record that it was not until roughly two months before the bench trial that Norfolk Southern learned of

---

[3] We do not have a final written contract between Basell and CSX, just as we have no final written contract between Basell and Norfolk Southern.

Basell's contract with CSX, during the deposition of Samuel Slovak, a Basell employee responsible for transportation procurement. Less than one month before trial, in a stipulation filed with the District Court, Norfolk Southern withdrew its original two counts and Basell withdrew its quantum meruit counterclaim. Less than one week before trial, Norfolk Southern notified the Court and Basell for the first time of two key changes in its litigation strategy: first, it was no longer pursuing any claim related to pellet-production facilities other than West Lake Charles and, second, it was now asserting that Basell's breach of the parties' West Lake Charles contract was material and that, therefore, Norfolk Southern could treat that contract as terminated. However, with the parties in agreement that there was a West Lake Charles contract and that Basell had breached it, the District Court did not concern itself with the state of the pleadings and ordered cross-summary judgment motions.

The issues before the District Court on summary judgment centered on whether Norfolk Southern should be permitted to terminate the contract and, if not, whether the proper remedy for the breach was lost profits or liquidated damages. Norfolk Southern argued that contract termination was appropriate because Basell materially breached and/or repudiated its contract with Norfolk Southern by entering into the February 2005 contract with CSX. This was the first time

8

that Norfolk Southern raised the issue of repudiation.[4]

The District Court concluded that Basell's breach was not material and that, therefore, Norfolk Southern could not terminate its contract with Basell; it did not address Norfolk Southern's repudiation argument. However, the Court determined that there was an immaterial breach and that the appropriate remedy was measured by lost profits. It awarded Norfolk Southern $270,430 for lost profits incurred through June 2006, which was the estimate of lost profits that Basell had submitted to the Court as part of its motion for summary judgment; Norfolk Southern's estimate had been $258,080. The Court found the estimates to be "strikingly similar" and chose the higher of the two, without explanation. *Norfolk S. Ry. Co. v. Basell USA, Inc.,* No. 05-3419, 2006 WL 1892726, at *5 (E.D. Pa. July 10, 2006).[5] The Court also ordered that Basell would be liable for any additional lost profits incurred by Norfolk Southern during the remaining eleven months of the contract as a result of any ongoing breach of the minimum volume commitment.

---

[4] The issue of Norfolk Southern's potential waiver of its contract termination, material breach, and repudiation theories by failing to plead them has not been raised on appeal.

[5] Neither party is challenging the District Court's determination that $270,430 was the proper measure of Norfolk Southern's lost profits through the end of June 2006.

9

Norfolk Southern continues to seek a ruling that it is entitled to terminate the contract because Basell's breach was material, or, alternatively, because Basell's conduct amounted to a repudiation. Norfolk Southern urges that under either scenario it would then be entitled to recover — as restitution — the difference between the tariff rate and the discounted rate for all deliveries originating in West Lake Charles that it made for Basell after Basell entered into its conflicting contract with CSX.

## II. Analysis

Our review of the District Court's grant or denial of summary judgment is plenary, and we apply the same standard that the District Court applied in determining whether summary judgment was appropriate. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276 (3d Cir. 2001). Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, we "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Abramson*, 260 F.3d at 276 (internal quotation marks omitted). Thus, if a reasonable fact finder could find in the nonmovant's favor, then summary judgment may not be granted. *Congregation Kol Ami v. Abington Twp.*, 309 F.3d

10

120, 130 (3d Cir. 2002).  Moreover, it is important to remember that, "[w]hile the individual pieces of evidence alone may not suffice to make out the claims asserted, we must view the record as a whole picture."  *Abramson,* 260 F.3d at 276.

As a federal court sitting in diversity, we "are required to apply the substantive law of the state whose laws govern the action," *Robertson v. Allied Signal*, 914 F.2d 360, 378 (3d Cir. 1990); here, we apply the law of Delaware.[6]   Therefore, our task is to predict how the Delaware Supreme Court would rule if it were deciding this case.  *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1445 (3d Cir. 1996).  Ideally, we would accomplish this task by simply applying the Delaware Supreme Court's precedents that are on point.  *Id.*  But, "[i]n the absence of guidance from the state's highest court, we must look to decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue," as well as to "analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand."  *Id.* (internal quotation marks omitted).

## A.  Material Breach

---

[6] The District Court found that Delaware law governs this action, *Norfolk S. Ry. Co. v. Basell*, 2006 WL 1892726, at *3 n.4, and neither party now disputes this determination.

For a breach to be material, it must "go[] to the essence of the contract." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 315 (3d Cir. 2001); it must be "of sufficient importance to justify non-performance by the non-breaching party," *Biolife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003) (internal quotation marks omitted). The Delaware Supreme Court has not addressed the issue, but other Delaware courts have consistently looked to the *Restatement (Second) of Contracts* to guide their material breach determinations. *See, e.g.*, *Biolife Solutions*, 838 A.2d 268; *Commonwealth Constr. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, No. 04L-10-101, 2006 WL 2567916, at *19 (Del. Super. Aug. 31, 2006); *SLMSoft.com, Inc. v. Cross Country Bank*, No. 00C-09-163, 2003 WL 1769770, at *13 (Del. Super. Apr. 2, 2003); *E. Elec. & Heating, Inc. v. Pike Creek Prof'l Ctr.*, 1987 WL 9610, at *4-5 (Del. Super. Apr. 7, 1987). According to the *Restatement*, the following five factors are significant in evaluating whether a particular breach of contract is material and termination is thus warranted:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

12

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing**.**

*Restatement (Second) of Contracts* § 241 (1981). These materiality factors are "to be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances." *Id.* § 241 cmt a. No single factor is dispositive.

Whether the breach of a contract is material is generally an issue of fact. *Saienni v. G & C Capital Group, Inc.*, No. 96C-07-151, 1997 WL 363919, at *3 (Del. Super. May 1, 1997); 23 Richard A. Lord, *Williston on Contracts* § 63:3 (4th ed. 1992). However, "[a]s is true of virtually any factual question, if the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law." *Gibson v. City of Cranston*, 37 F.3d 731, 736

13

(1st Cir. 1994); *accord Saienni*, 1997 WL 363919, at \*3; 23 *Williston on Contracts*, *supra*, § 63:3. Thus, in certain situations, it can be appropriate to determine the issue of material breach at the summary judgment stage.[7]

The District Court correctly identified the *Restatement* factors, but, we conclude, erred in concluding that "no reasonable fact finder could find that Basell's breach of its volume commitment is a material breach." *Norfolk S. Ry. Co. v. Basell USA, Inc.,* No. 05-3419, 2006 WL 1892726, at \*4 (E.D. Pa. July 10, 2006). It focused almost exclusively on the second factor, and failed to consider adequately whether and how each of the five factors could be viewed by a reasonable fact finder as supporting Norfolk Southern's material breach argument. Evaluating each factor and the record as a whole in the light most favorable to Norfolk Southern, we conclude that

---

[7] We do not believe that the Delaware Superior Court's decision in *SLMSoft.com, Inc.*, 2003 WL 1769770, is to the contrary. There, the court found that determining whether a material breach had occurred "clearly involve[d] issues of material fact, thus making summary judgment inappropriate." *Id.* at \*13. We do not read this to mean that the issue of material breach can never be decided as a matter of law, no matter how lopsided or undisputed the record may be. Rather, we understand the court's statement to mean that the particular case before it did not present such a situation, as the material facts remained in dispute.

the District Court erred in ruling on summary judgment that Basell's breach of the West Lake Charles contract was not material.

Before applying the first *Restatement* factor, which focuses on the deprivation of the "benefit" bargained for, it is helpful to consider how both the customer and the supplier benefit from a requirements contract like the one between Basell and Norfolk Southern. The customer "gets the assurance of a source of supply" for a particular good or service, perhaps for a fixed price, without having to commit ahead of time to purchasing a fixed quantity of that good or service. 2 Joseph M. Perillo & Helen Hadjiyannakis Bender, *Corbin on Contracts* § 6.5 (Rev. Ed. 1995). The supplier benefits, even though the actual amount of business that it will receive under the contract is uncertain, because it "locks in a customer" for a set percentage (if not all) of whatever quantity the customer ends up requiring. *Id.* Here, the percentage was 95% of Basell's shipments.

Regarding the first factor, the District Court found that, "[a]long with three years of full performance, the fact that Basell's shortfall is only 15% underscores the limited extent to which Norfolk Southern has been deprived of the benefit it reasonably expected from the contract." *Norfolk S. Ry. Co.*, 2006 WL 1892726, at *4. However, Norfolk Southern argues that it bargained for nearly all the shipments — 95% — and that it would not have agreed to give Basell a discounted rate, below

15

the published tariff rate, if not for the minimum volume commitment.  It reasonably expected 95% in exchange for the guaranteed discounted delivery services and, it urges, 80%, quite simply, is not 95%.  Moreover, Norfolk Southern contends, the 80% figure is deceptive because the majority of that 80% consists of captive rail direct traffic that Basell had no choice but to provide to Norfolk Southern.  It maintains that it discounted its rates for all of Basell's traffic, including the captive rail direct traffic, so as to capture the *competitive* traffic.  According to Norfolk Southern, it reasonably expected that the agreement for 95% of all traffic meant that it would receive the vast majority of the competitive rail direct traffic originating from the West Lake Charles facility, whereas, due to Basell's breach, it only received 55% of it.  Further, while Basell had fully performed for three years before its breach, over two years remained on the contract once the shortfall began; Basell made no indication that it would again fulfill its minimum volume commitment.  A reasonable fact finder could credit these arguments and find that Norfolk Southern was substantially deprived of the benefit that it had reasonably expected when entering into the West Lake Charles contract, such that the first *Restatement* factor supports a material breach determination.

The *Restatement* explains that the second factor — the extent to which the non-breaching party can be adequately compensated for the loss of benefit — "is a corollary of the first" and that "[d]ifficulty . . . in proving with sufficient certainty the amount of that loss will affect the adequacy of

16

compensation." *Restatement (Second) of Contracts* § 241 cmt c. The District Court found this factor to be the most significant and determined that "Norfolk can be adequately compensated for Basell's breach because Norfolk's present damages are readily calculable." *Norfolk S. Ry. Co.*, 2006 WL 1892726, at *4. A reasonable fact finder could come to the opposite conclusion. First, Basell and Norfolk Southern submitted to the Court differing present-damage estimates — $270,430 and $258,080, respectively. It is true that only about $12,000 separated these estimates, but a $12,000 difference is not too small to indicate a lack of certainty regarding the calculations. Second, there was a strong likelihood of future lost profits during the remaining eleven months of the contract — due to Basell's conflicting contractual obligations to CSX — and inherent uncertainty regarding precisely how large those additional damages would be. The District Court did address this issue in its order, stating that Basell would be liable for any lost profits caused by any further failure to meet its minimum volume commitment to Norfolk Southern. A reasonable fact finder, however, could find that an order granting a yet-to-be-determined amount of damages raised, rather than resolved, concerns regarding the present ease of calculating damages.

The third factor is the extent to which the breaching party will suffer forfeiture if the non-breaching party is permitted not to perform. In elucidating this factor, the *Restatement* explains that there is a risk of forfeiture when the breaching party "has relied substantially on the expectation of the exchange, as

through preparation or performance." *Restatement (Second) of Contracts* § 241 cmt d. Therefore, as the District Court noted in its brief apparent reference to forfeiture, a breach is "less likely to be regarded as material if it occurs late, after substantial preparation or performance." *Id.*; *see Norfolk S. Ry. Co.*, 2006 WL 1892726, at *4. Basell argues that it would suffer considerable forfeiture if Norfolk Southern is absolved from performing and is allowed to charge the published tariff rate for deliveries made under the contract. Basell maintains that, if not for the promised discounted rate, it would not have chosen to use Norfolk Southern for any of its competitive West Lake Charles traffic. Thus, the argument goes, permitting Norfolk Southern to eliminate the discount retroactively would result in a windfall for Norfolk Southern and forfeiture for Basell. Moreover, Basell performed fully for three years, and relied on Norfolk Southern's performance by marketing its plastic products based on the agreed-upon transportation costs. On the other hand, it could be argued that three years into a five-year contract is not all that "late." Furthermore, the District Court did not address the cause of the "forfeiture" — namely, Basell's own undertaking of a conflicting obligation. We believe consideration should have been given to the fact that any resulting forfeiture would have been of Basell's own making. *See Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 232-33 (1959) (explaining that "the maxim that no man may take advantage of his own wrong" is "[d]eeply rooted in our jurisprudence [and] has been applied in many diverse classes of cases by both law and equity courts"); 13 *Williston on*

18

*Contracts*, *supra*, § 39:6 (noting "the long-established principle of law that one should not be able to take advantage of his or her own wrongful act").

As for the fourth factor — the likelihood of cure by the breaching party — the District Court emphasized that "although Basell does not promise that it will not breach the contract going forward, Basell states that 'it is not a foregone conclusion that Basell will not meet the minimum volume commitment in 2006' and '[t]here could very well be no shortfall in 2007.'" *Norfolk S. Ry. Co.*, 2006 WL 1892726, at *4 (alteration in original). Even if Basell's statements were correct (and they indeed might have been), the fourth materiality factor asks whether it is likely that the breaching party will perform its contractual duties going forward, not merely whether such performance is theoretically possible. Here, Basell's contract with CSX — the very contract that had caused the shortfall in the first place — remained in effect until the end of January 2007. Basell gave no assurance that it would fulfill its minimum volume commitment to Norfolk Southern going forward — either before or after the CSX contract expired. Thus, a reasonable fact finder could find that the likelihood of cure was low and that this fourth Restatement factor points toward materiality.

The District Court referred to the fifth and final factor — that is, the extent to which the breaching party's behavior comported with standards of good faith and fair dealing — only briefly, stating that "the Court does not accept Norfolk's

19

characterization of the breach, namely that Basell's business decision, driven by operational needs, amounted to a spiteful 'slap in the face' to Norfolk." *Norfolk S. Ry. Co.*, 2006 WL 1892726, at *4. The Court seems to credit Basell's argument that it had breached its contract with Norfolk Southern due to operational efficiency requirements and that this explanation for its conduct should preclude a bad faith finding. We view this as a problematic conclusion to reach on summary judgment for a number of reasons. First, the record support for Basell's argument is very weak. Slovak, Basell's transportation-procurement manager, testified that Basell shifted *truck terminal* traffic to CSX due to "operational" needs. This testimony is arguably irrelevant because, according to Basell's own calculations, truck terminal traffic did not account for any of its shortfall in reaching its minimum volume commitment to Norfolk Southern. Second, a reasonable fact finder could find that, despite any operational needs that Basel may have had, entering into a contract with CSX that required the diversion of traffic that it had already contractually promised to Norfolk Southern was inconsistent with standards of good faith and fair dealing.

Taking all of the factors together, we find that, on balance, they tilt instead in Norfolk Southern's favor when viewed through the pro-Norfolk Southern lens of summary judgment. Therefore, a reasonable fact finder could conclude that, under the *Restatement* factors, the breach was material. The District Court thus erred in deciding on summary judgment

20

that Basell did not materially breach its contract with Norfolk Southern.

We wish to make clear, however, that we do not hold that the District Court instead should have found on summary judgment that the breach was material. Just as a reasonable fact finder could conclude that the breach was material, a reasonable fact finder could conclude — as the District Court did — that the breach was not material. Reasonable minds could differ and summary judgment is, therefore, not the appropriate way to resolve the issues presented in this case.

In addition, we note that, although it is not impossible, determining whether a breach is material on summary judgment is inherently problematic where, as here, the materiality analysis may well turn on subjective assessments as to the state of mind of the respective parties. As we have emphasized in the past, "a court should be reluctant to grant a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind, for in such cases much depends upon the credibility of witnesses testifying as to their own states of mind, and assessing credibility is a delicate matter best left to the fact finder." *Metzger v. Osbeck*, 841 F.2d 518, 521 (3d Cir. 1988) (internal quotation marks omitted). Here, the issue of the materiality of a breach under the *Restatement*'s analytical framework presents such a situation, as the analysis depends greatly on an evaluation of why the parties chose to act as they did. Under the first *Restatement* factor, the court must

21

determine what Norfolk Southern subjectively expected to get out of the contract, before it decides whether those expectations were reasonable. Conversely, the fifth factor calls for an evaluation of what motivated Basell's conduct — specifically, whether it committed the breach in good faith or in bad faith. In addition, the fourth factor entails an assessment of whether Basell intends to perform its contractual obligations in the future, and, if the answer is yes, whether it can be trusted to do so. The determination of "materiality" in a factual setting such as this is best made after trial.

## B. Repudiation

As we noted above, Norfolk Southern sought an alternative holding from the District Court that Basell's conduct amounted to a repudiation, and that it could, therefore, terminate the contract and recover the full tariff rate for all deliveries originating in West Lake Charles made after Basell entered into its contract with CSX.

The *Restatement* defines a repudiation as

(a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach under §243, or

(b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.

*Restatement (Second) of Contracts* § 250. The illustrations included with this section of the *Restatement* indicate that entering into a conflicting contract can satisfy the second prong of the definition. *Id.* illus. 1, 5 ("On April 1, A contracts to sell and B to buy land, delivery of the deed and payment of the price to be on July 30 . . . , A says nothing to B on May 1, but on that date he contracts to sell the land to C. A's making of the contract with C is a repudiation.") Like material breach, repudiation by one party to a contract entitles the other party to terminate that contract. *Id.* § 253.

The Delaware Supreme Court endorsed the first prong of the *Restatement*'s definition in a case where one party's *statement* allegedly constituted a repudiation. *CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928, 931 n.7. The Delaware Court of Chancery endorsed the second prong in a case where one party's *conduct* allegedly constituted a repudiation, *Univ. Realty Assocs., Inc. v. Wendy's Old Fashioned Hamburgers of N.Y., Inc.*, No. 12345, 1992 WL 368593, at * 6 (Del. Ch. Dec. 11, 1992), and we have no reason to doubt that the Delaware Supreme Court would do the same.

The District Court did not directly address Norfolk Southern's contention that, by entering into the February 2005

23

contract with CSX, Basell had repudiated its contract with Norfolk Southern under the conduct prong of the *Restatement*'s definition. At most, the Court alluded to the issue in its discussion of material breach, when it found that it was not a "foregone conclusion" that Basell would breach its contract with Norfolk Southern in 2006. *See Norfolk S. Ry. Co.*, 2006 WL 1892726, at *4. But in ruling that the contract was not terminable, the Court implicitly rejected Norfolk Southern's repudiation argument.

A district court's failure to consider an issue below does not necessarily preclude us from addressing it on appeal. *Hudson United Bank v. LiTenda Mortgage Corp.*, 142 F.3d 151, 159 (3d Cir. 1998). However, it is only appropriate for us to do so "*when the factual record is developed* and the issues provide purely legal questions, upon which an appellate court exercises plenary review." *Id.* (emphasis added). In situations "where the resolution of an issue requires the exercise of discretion or fact finding . . . , it is inappropriate and unwise for an appellate court to step in." *Id.*

Here, the record is not sufficiently developed for us to consider the merits of the parties' arguments as to repudiation. Norfolk Southern contends that the CSX contract rendered Basell either "unable or apparently unable" to fulfill its pre-existing contractual obligations to Norfolk Southern, maintaining that Basell agreed to use CSX for at least 95% of the same traffic that had already been promised to Norfolk

Southern. Basell counters that its contract with CSX covered only some of the same traffic as its contract with Norfolk Southern, and that fulfillment of both was theoretically possible, depending on the "ebb and flow" of the marketplace. Although it is undisputed that Basell's CSX contract ended up causing its failure to meet its 2005 minimum volume commitment to Norfolk Southern, the current record does not reveal whether this was inevitable, or apparent, from the start. It remains unclear what traffic Basell had promised to CSX, and this information is crucial for an evaluation of Norfolk Southern's repudiation argument. Without knowing with greater specificity what Basell's CSX contract required, it is impossible to determine as a matter of law whether entering into that contract rendered Basell unable or apparently unable to fulfill its contract with Norfolk Southern. Norfolk Southern seems to have learned of the CSX contract only two months before the Court ordered cross-summary judgment motions, and the record is still too sparse regarding that contract's details for us to rule on the issue. Therefore, we will leave this issue for the District Court to decide on remand after further factual development.[8]

---

[8] Similarly, we will not address the issue as to whether, and to what extent, Norfolk Southern would be entitled to restitution if the District Court finds a material breach or repudiation. We leave that for the District Court to determine in the first instance.

### III. Conclusion

For these reasons, we will VACATE the District Court's summary judgment order insofar as it concluded, explicitly, that the breach was not material and, implicitly, that there was no repudiation.[9]  We will REMAND for further proceedings consistent with this opinion.

_____

___

[9] Insofar as the District Court's award of damages for lost profits based on an immaterial breach is not challenged on appeal, that aspect of its ruling is not vacated but would control should it determine on remand that Basell did not materially breach or repudiate its contract with Norfolk Southern.