NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1596
_____

FREDERICK LIVINGSTON, Appellant

v.

ALLEGHENY COUNTY;
ALLEGHENY COUNTY OFFICE OF CHILDREN, FAMILY AND YOUTH ("OCYF");
NICOLE LUBATTI, OCYF Caseworker;
BETSY CAREOFF, OCYF Caseworker;
KAREN NEPPACH, OCYF Caseworker;
DDBORAH SADLER-KIMES, OCYF Caseworker;
KELLY HITCHENS, OCYF Caseworker and;
AMANDA ORR, OCYF Caseworker in their individual and official capacities;
DENNIS KOZLOWSKI, Allegheny County Detective;
SEAN KELLY, Allegheny County Detective and;
JEFF CORCHECK, Allegheny County Detective in their individual and official capacities;
CHARLES MOFFAT, Superintendent of the Allegheny County Police Department,
in his individual and official capacity;
ADELLA DIXON, both individually and in her capacity as an employee of FAMILYLINKS

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN
DISTRICT OF PENNSYLVANIA
(D.C. Civ. Action No. 2:07-cv-1010)
Magistrate Judge: Honorable Lisa Pupo Lenihan
_____

Argued on October 19, 2010
_____

Before: HARDIMAN, GREENAWAY, JR., and NYGAARD, Circuit Judges

(Opinion Filed: November 8, 2010)

Robert J. Grimm, Esq. (Argued)
Daniel R. Michelmore, Esq.
Swartz Campbell
600 Grant Street
4750 U.S. Steel Tower

Pittsburgh, PA 15219
  (*Counsel for Appellant*)


Caroline P. Liebenguth, Esq. (Argued)
Michael H. Wojcik, Esq.
Office of Allegheny County
Law Department
445 Fort Pitt Boulevard
300 Fort Pitt Commons Building
Pittsburgh, PA 15219
  (*Counsel of Appellee*)

—————————

OPINION

GREENAWAY, JR., Circuit Judge

Frederick Livingston ("Livingston") appeals the Magistrate Judge's order granting summary judgment in favor of Allegheny County; Allegheny County Office of Children, Youth and Family ("CYF");[1] CYF caseworkers Nicole Lubatti ("Lubatti"), Betsy Careoff ("Careoff"), and Karen Neppach ("Neppach"); police officers Dennis Kozlowski ("Kozlowski"), Sean Kelly ("Kelly"), and Jeff Korczyk ("Korczyk"); and police superintendent Charles Moffat ("Moffat") (collectively, the "Appellees") for claims arising under 42 U.S.C. § 1983.[2] Livingston asserts that genuine issues of material fact exist as to his Fourteenth Amendment substantive due process claim and his Fourth Amendment probable clause claim. We disagree. For the following reasons, we will affirm the grant of summary judgment.

---

[1] The caption incorrectly addresses CYF as Allegheny County Office of Children, Family and Youth. We will use the correct name, Allegheny County Office of Children, Youth, and Family.

[2] Livingston initially brought suit against additional defendants, who were either voluntarily dismissed from the suit or for whom Livingston does not oppose summary judgment.

2

# I. <u>BACKGROUND</u>

We write solely for the benefit of the parties and recount only the essential facts.

Livingston lived on and off with his two daughters, N.W. and B.W., and their mother, Carmen Williams ("Williams"). The family had problems, primarily because of the parents' disciplinary issues with the two daughters. In March 2002, B.W., Livingston's younger daughter, informed a school nurse that Livingston had physically abused her. After conducting an investigation, the Allegheny County Department of Human Services concluded the abuse allegations were "unfounded." (App. at 367.) The caseworker allegedly explained to Livingston that unfounded abuse allegations were common from children with disciplinary issues.

From 2002–2004, Livingston filed three dependency petitions for B.W. in an effort to address her disciplinary problems, which included an arrest and a charge with criminal mischief. The second and third petitions led to investigations where CYF caseworkers reported there was no abuse or neglect of either B.W. or N.W. As a result of the third petition, B.W. was adjudicated delinquent and ordered to remain with her mother and have no contact with Livingston. Her disciplinary problems continued, and she was placed in a shelter to undergo an evaluation for drug, alcohol, and mental health issues. Livingston alleges that B.W. accused him of abuse for a second time at her shelter hearing on November 14, 2004, but that the judge rejected B.W.'s contentions. CYF caseworker Lubatti, who was responsible for the Livingston family's case, understood B.W. to be manipulative and untruthful.

Livingston had disciplinary problems with N.W., his older daughter, as well. N.W. was lying to her parents and spending nights at her boyfriend's home. Livingston claimed he received close to $3000 in medical bills for either an abortion or miscarriage of a child that N.W.

3

was carrying; however, N.W. denies being pregnant.  On or around October 14, 2004, N.W. attempted suicide by taking several pills and slitting her wrists.  Allegedly, this was not her first suicide attempt.

Livingston began to express frustration with CYF's inability to resolve the family's issues.  A supervisor at CYF believed Livingston controlled and intimidated women and wanted a male working on Livingston's case.

On or around March 30, 2005, B.W. met with psychologist Dr. Pat Piercy as part of the family's plan with CYF to resolve their issues.  B.W. alleged to Dr. Piercy in this meeting that Livingston had sexually abused her sister, N.W.  The allegations were automatically reported to CYF, and two CYF caseworkers were sent to interview N.W. at school.  N.W. confirmed that Livingston had in fact sexually abused her.  Williams purportedly responded to CYF's questions regarding the allegations against Livingston with doubt and was hesitant to set a "safety plan" to remove N.W. from Livingston's presence.  CYF removed N.W. from Williams and Livingston, and placed her with her maternal grandmother.

The Allegheny County Protocol for Investigation and Prosecution of Child Abuse Cases ("Protocol") includes standards and procedures for investigating child abuse cases, as mandated by Pennsylvania Child Protective Services Law.  The Protocol is applicable to Allegheny County's Multidisciplinary Child Abuse Team, which includes CYF and the Allegheny County Police.  Under the Protcol, reports of physical or sexual child abuse require certain procedures, consisting of: 1) an initial report to determine risk to the child; 2) an initial interview of the alleged victim, if absolutely necessary; 3) an interview of the alleged victim by a trained professional, observed by CYF caseworkers and the detectives; 4) gathering of any and all

evidence, including physical evidence, hospital records, school records, and any other relevant evidence; 5) an interview of other witnesses, such as physicians treating the child, other children in the house during the period when the assault occurred, and the child's pediatrician (for insight into the physical and emotional state of the child and family history); and 6) an interview with the alleged perpetrator.[3]

On April 13, 2005, CYF caseworker Neppach arranged for Dr. Susan Nathan, a licensed psychologist to conduct a psychological evaluation of N.W., which Neppach, Detective Kelly, and Kelly Hitchens observed. In the forensic interview, N.W., who was 17 years old at the time, described the manner in which Livingston had sexually abused her from the time she was in elementary school until she was 14 years old. N.W. explained that she and her mother had repeatedly reported physical abuse to the police since she was six years old, but the police took no action because Livingston himself was a police officer. According to N.W., Williams was in denial about the sexual abuse. Dr. Nathan ultimately concluded that "based on the interview, there is a probable likelihood that [N.W.] has experienced a chronic history of sexual abuse by her father," but that CYF and the police should consider conducting a forensic interview of B.W. as well. (Id. at 463.)

At the end of the forensic interview, N.W. took the Trauma Symptom Checklist for Children and Adolescents, which assesses post-traumatic stress and related psychological

_____

[3] The Protocol also requires that the child be taken to the hospital in an emergency situation, the detectives and CYF caseworkers handling the case keep each other informed regarding judicial and administrative proceedings, and the child victim and non-offending family members be informed of victims' services available to them. Mental health workers should not be interviewed.

symptoms. She scored in the "clinically significant range" for numerous categories— anxiety, depression, anger, posttraumatic stress, dissociation, and sexual concerns. (Id.)

Neppach discussed the forensic interview with Dr. Nathan and subsequently "indicated" a report of child abuse against Livingston, which denotes substantial evidence exists that the child abuse allegations may be true. Neppach then proceeded to conduct a full investigation. She interviewed Livingston, who denied the allegations, and attempted to contact Williams. Neppach did not interview B.W., nor did she contact R.B., who allegedly could have corroborated N.W.'s allegations. Moreover, Neppach did not review Livingston's CYF file or N.W.'s and B.W.'s school and hospital records.

The police department's investigation consisted of observing N.W.'s forensic interview, and questioning B.W., Williams, Livingston, and N.W. for a second time. Based on the detectives' findings, the Deputy District Attorney who was in charge of the child abuse unit, Laura Ditka, recommended filing criminal charges.

Ultimately, a criminal trial was conducted and the jury acquitted Livingston of the criminal charges. After the acquittal, the CYF report "indicating" child abuse was expunged. On July 9, 2007, Livingston filed a lawsuit in the United States District Court for the Western District of Pennsylvania against Appellees for claims arising under 42 U.S.C. § 1983.[4] The

---

[4] Livingston's complaint alleged civil rights violations of false arrest, false imprisonment, malicious prosecution, substantive due process violations, conspiracy to violate civil rights and municipal liability under 42 U.S.C. § 1983 and § 1985 against all defendants. The complaint also included state claims of false arrest, false imprisonment, intentional infliction of emotional distress, malicious prosecution, and negligence in the alternative. The Magistrate Judge declined to exercise supplemental jurisdiction over the state claims. The only issues on appeal are the Section 1983 civil rights claims.

6

defendants filed a motion for summary judgment, which the Magistrate Judge granted. Livingston appeals the Magistrate Judge's order granting summary judgment.

## II. JURISDICTION AND STANDARD OF REVIEW

The parties consented to Magistrate Judge Lenihan's jurisdiction to conduct all proceedings, including directing the entry of a final judgment of the district court, pursuant to 28 U.S.C. § 636(c). The parties had the right to appeal directly to the court of appeals. We have jurisdiction to review a final decision by the District Court under 28 U.S.C. § 1291.

We review an order granting summary judgment under a plenary standard of review and apply the same standard as the District Court to determine whether summary judgment was appropriate. State Auto Prop. & Cas. Ins. Co. v. Pro Design, P.C., 566 F.3d 86, 89 (3d Cir. 2009) (citing Norfolk S. Railway Co. v. Bassell USA Inc., 512 F.3d 86, 91 (3d Cir. 2008)). "A grant of summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Id. (quoting FED. R. CIV. P. 56(c)). "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010) (citation omitted) (internal quotation marks omitted); see also Miller v. City of Philadelphia, 174 F.3d 368, 377 (3d Cir. 1999) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986)) ("[T]he non-movant must 'produce some (that is, more than a 'scintilla' of) evidence in support of his position.'").

## III. ANALYSIS

Summary judgment is appropriate in favor of Appellees if no genuine issue of material fact exists with respect to Livingston's Fourteenth Amendment substantive due process claim or his Fourth Amendment claim.

A.      Substantive Due Process Claim

To establish a claim under 42 U.S.C. §1983,[5] "plaintiffs must show that the defendant, under the color of state law, deprived them of a federal constitutional or statutory right." Miller v. Mitchell, 598 F.3d 139, 147 (3d Cir. 2010) (citation omitted); see Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  The first step is to determine "the exact contours of the underlying right said to have been violated." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998) (citations omitted).  Natural parents have a fundamental liberty interest "in the care, custody, and management of their child." Miller, 174 F.3d at 373 (citing Santosky v. Kramer, 455 U.S. 745, 753 (1982)) (internal quotation marks omitted).

A parent's liberty interest can be overridden by the government's compelling interest to protect children, and "does not include a right to remain free from child abuse investigations." Croft v. Westmoreland Cnty. Children & Youth Serv., 103 F.3d 1123, 1125 (3d Cir. 1997) (citation omitted).  The state must have "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." Id. at

---

[5] Section 1983 subjects to liability:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

42 U.S.C. § 1983.

1126 (citation omitted) ("Our focus here is whether the information available to the defendants at the time would have created an objectively reasonable suspicion of abuse justifying the degree of interference . . . .").

While the government may investigate child abuse claims, official conduct must still comport with substantive due process. "[E]gregious official conduct" which "shock[s] the conscience" violates substantive due process. Miller, 174 F.3d at 375 (quoting Lewis, 523 U.S. at 846). A social worker's actions shock the conscience when they "exceed both negligence and deliberate indifference, and reach[es] a level of gross negligence or arbitrariness . . . ." Id. at 375-76 (explaining that the culpability standard does not require a "purpose to cause harm"). Specifically, we ask if the social worker "consciously disregarded a great risk that there had been no abuse." Ziccardi v. City of Philadelphia, 288 F.3d 57, 66 (3d Cir. 2002) (elaborating on the standard set forth in Miller).

No genuine issue exists in this case as to whether Appellees' actions "shocked the conscience." Appellees' investigation certainly may have benefitted from additional interviews and evidence collection. Dr. Nathan recommended a forensic interview of B.W. and none was conducted. Appellees did not collect N.W.'s or B.W.'s school and hospital records, or CYF files. Evidence from these records and files would have revealed B.W.'s previous false allegation of physical abuse, CYF's prior findings of no abuse in the Livingston house, and N.W.'s recent suicide attempt and emotional state. Yet, these failures do not rise to the required culpability standard that their behavior "shocked the conscience."

In Croft, we reversed summary judgment for a substantive due process claim where the caseworker presented the father accused of abuse with an ultimatum that the child would be

9

removed from the house if the father did not leave. 103 F.3d at 1124-25. The caseworker's actions were an arbitrary abuse of government power because the caseworker had no physical evidence of abuse *and* testified that she did not have enough evidence to determine whether abuse occurred. Id. at 1127 (finding "most damaging . . . that, after the interviews [with the Crofts, the caseworker] had no opinion one way or the other whether sexual abuse had occurred"). The information available to the defendants at the time did not justify the degree of interference. Id. at 1126.

Croft is easily distinguished from this case. Neppach based her "indication" of abuse on observing N.W.'s forensic interview and Dr. Nathan's conclusion that "there is a probable likelihood that [N.W.] has experienced a chronic history of sexual abuse by her father." (App. at 463.) Similarly, the detectives observed N.W.'s forensic interview, re-interviewed her a second time, and spoke to B.W., Williams, and Livingston, crucial witnesses to the allegations. Thus, the "information available to [Appellees] at the time," observations from N.W.'s forensic interview, Dr. Nathan's conclusions, and other witness interviews, "created an objectively reasonable suspicion of abuse." See Croft, 103 F.3d at 1126. No evidence suggests that Appellees "consciously disregarded a great risk that there had been no abuse." Ziccardi, 288 F.3d at 66.[6]

---

[6] Livingston asserts that Appellees brought criminal charges out of retaliation for his disagreements with CYF. Despite CYF observing and commenting upon Livingston's intimidating and controlling demeanor towards women, the record does not suggest that any actions CYF took were based on this belief about Livingston. In fact, the record is clear that CYF "indicated" its report of sexual abuse because of B.W.'s initial statements of abuse, N.W.'s forensic interview, and Dr. Nathan's conclusion of a probable likelihood that abuse occurred. With respect to the detectives, Livingston alleges that they intimidated Police Officer Leslie Lewis from testifying as a character witness at Livingston's criminal trial. He provides no basis

Livingston further contends that Appellees' failure to follow the "constitutionally adequate Protcol" shocks the conscience. (Appellant's Br. 29.) However, failure to strictly adhere to the Protocol does not by itself amount to a violation of substantive due process. See J.R. v. Gloria, 593 F.3d 73, 79, 81 (1st Cir. 2010) (holding that defendant's failure to conduct steps required by DCYF policy on investigating foster care placement "does not amount to inherently egregious conduct").

Accordingly, no genuine issue of material fact exists as to whether Appellees' actions shocked the conscience. We will affirm the grant of summary judgment on Livingston's substantive due process claim.

B. Fourth Amendment Claim

Similarly, no genuine issue of material fact exists as to whether Appellees had probable cause to arrest Livingston. The Fourth Amendment affords people the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, . . . and no Warrants shall issue, but upon probable cause . . . ." U.S. CONST. amend. IV; see also Reedy v. Evanson, 615 F.3d 197, 211 (3d Cir. 2010) (citation omitted) ("It is well-established that the Fourth Amendment 'prohibits a police officer from arresting a citizen except upon probable cause.'"). Probable cause to arrest is present "when the facts and circumstances within the arresting officer's knowledge [at the time of the arrest] are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be

---

for their alleged retaliation. Additionally, the record indicates that the detectives brought criminal charges based on their independent investigation.

arrested." Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788, 789 (3d Cir. 2000) (citation omitted) (internal quotation marks omitted).

As was the case with his substantive due process claim, Livingston argues that Appellees lacked probable cause because they did not conduct a thorough investigation. Livingston highlights failures in Appellees' investigation, arguing that they should have interviewed N.W.'s friend to corroborate the story, and B.W. to determine her credibility. But, the proper inquiry is whether "the facts and circumstances *within the arresting officer's knowledge*" were sufficient to warrant a reasonable belief that the offense was committed. Id. (emphasis added). Appellees have clearly satisfied this standard. The facts and circumstances within Appellees' knowledge were statements by the victim herself, N.W., and the victim's sibling, B.W., that Livingston sexually abused N.W. Appellees also observed and relied on Dr. Nathan's forensic interview, from which Dr. Nathan concluded a "probable likelihood" that Livingston sexually abused N.W. (App. at 463.) These statements and conclusions are sufficient to create a reasonable belief that the offense was committed. The detectives also consulted with the Deputy District Attorney, who recommended that they file criminal charges. Once probable cause to arrest existed in Appellees' minds, they were not required to investigate further. See Merkle, 211 F.3d at 790 n.8 (Appellees "w[ere] not required to undertake an exhaustive investigation in order to validate the probable cause that, in [their] mind, already existed.").

### IV. CONCLUSION

For the reasons set forth above, we will affirm the grant of summary judgment in favor of Appellees.