NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-2438
_____

BULL INTERNATIONAL, INC.,
Appellant

v.

MTD CONSUMER GROUP, INC.,
successor in interest to CUB CADET CORPORATION t/d/b/a MTD PRODUCTS, INC.,
MTD CONSUMER GROUP, CUB CADET CORPORATION, BOLENS, COLUMBIA,
CUB CADET COMMERCIAL, CUB CADET YANMAR, FARM KING,
GARDEN WAY, GOLD SERIES, GUTBROD, GUTBROD-KEHRER, LAWN FLITE,
MASTERCUT, MOW MASTER, MOW MASTER MASTERCUT, MTD BLACK
EDITION, MTD SILVER EDITION, MTD GOLD, MTD MOWMASTER, MTD
PLATINUM PRO, MTD PLATINUM SD, MTD PRO, MTD SUPER, MTD TARAL,
MTD TRADESMAN, MTD TURBOMAX, MTD 2000 ELITE, NOVOTRAC, RANCH
KING, RASENTRAC, REMINGTON, RYOBI, TROY-BILT, VENTZKI, VENTZKI
MTD, WHITE OUTDOOR, YARD MACHINES, YARD-MAN, YARD-MAN ELITE,
YARD-MAN SELECT, and YARDWORKS
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(No. 2:14-cv-00255)
Honorable David Stewart Cercone, District Judge
_____

Argued March 2, 2016

BEFORE:  JORDAN, GREENBERG, and SCIRICA, Circuit Judges

(Filed: June 29, 2016)
_____

Jeffrey J. Ludwikowski (argued)
Gregory M. Monaco
Picadio Sneath Miller & Norton, P.C.
Four Gateway Center
444 Liberty Avenue, Suite 1105
Pittsburgh, PA 15222

    Attorneys for Appellant

Frederick W. Bode, III
Steven W. Zoffer (argued)
Brett W. Farrar
Michael P. Flynn
Dickie McCamey & Chilcote, P.C.
Two PPG Place, Suite 400
Pittsburgh, PA 15222-5402

    Attorneys for Appellee

Gregory A. Holmes
Holmes Law Offices PLLC
P.O. Box 2280
Concord, NH 03302

    Attorney for Amici Curiae
    Northeast Equipment Dealers
    Association and Ohio-Michigan
    Equipment Dealers Association

_____

OPINION*
_____

GREENBERG, Circuit Judge.

## I.    INTRODUCTION

_____

*This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

This matter comes on before this Court on an appeal from an order of the District Court granting motions by defendant-appellee, MTD Consumer Group, Inc. ("MTD"), an Ohio corporation with its principal place of business in Cleveland, Ohio, seeking dismissal of this action brought against it by plaintiff-appellant, Bull International, Inc. ("Bull"), a Pennsylvania corporation with its principal place of business in Washington, Pennsylvania. Bull brought this action because MTD terminated certain written contracts that it had with Bull setting forth the terms of the relationship between Bull, a family-owned business dealing in lawn and garden, commercial mowing, and farm and light industrial equipment in Western Pennsylvania, and MTD, a global manufacturer of equipment that Bull and other retailers sold.

The written contractual relationship between Bull and MTD with which we are concerned dates from 1985 when Cub Cadet Corporation ("Cub Cadet"), a predecessor in interest to MTD, entered into several agreements ("Agreements") that provided for Bull to sell at retail products that MTD manufactured under MTD's Cub Cadet brand. Though the Agreements did not specify their temporal length, two of the Agreements provided that either party could terminate that Agreement at any time after providing 30 days prior written notice to the other party. The Agreements did not require that the party terminating an Agreement state or have a cause for the termination. Essentially, therefore, the Agreements were contracts at will. The Agreements provided that any questions or matters arising under them would be subject to Ohio law.

We draw the inference from Bull's complaint and amended complaint that the relationship between Bull and MTD proceeded without incident for many years. Indeed,

3

Bull became an exclusive Cub Cadet dealer for lawn and garden products in 1991, after which Bull did not sell other manufacturers' lawn and garden products. In September 2013, however, MTD's attorney wrote Bull to inform it that MTD would terminate its Wholesale Finance Agreement and Sales and Service Agreement with Bull effective after expiration of the 30-day notice period provided in the Agreements. Bull objected to the termination, claiming that under the statute regulating equipment dealer agreements in Ohio, Ohio Rev. Code §§ 1353 et seq. ("OEDA"), enacted in 2001, MTD only could terminate its Agreements with Bull for "good cause" after providing no fewer than "one hundred eighty days' prior written notice." Id. § 1353.06 (A)(1) and (B).[1] But MTD denied that the Agreements were subject to the OEDA's procedural and substantive termination requirements inasmuch as the parties had executed the Agreements more than 15 years prior to their enactment. Therefore, notwithstanding Bull's objection, MTD terminated its Agreements with Bull without giving a reason for why it was doing so and without providing notice beyond the 30-day period required by the Agreements.

Bull responded by filing a nine-count complaint, the details of which we discuss below, in the District Court against MTD. MTD moved to dismiss the complaint but Bull, with leave of the Court, then amended its complaint to add a tenth count, which MTD also moved to dismiss. On May 11, 2015, the Court filed an opinion and entered an order granting MTD's motions to dismiss from which, in June 2015, Bull filed a timely notice of appeal. We conclude that the Court erred when it dismissed a claim that

---

[1] Our citations to the Ohio Revised Code throughout this opinion are to Title 13 of the Code.

4

Bull predicated on MTD's breach of an implied warranty of merchantability with respect to the products it supplied to Bull.  Therefore, we in part will reverse the May 11, 2015 order and will remand the case to the District Court for further proceedings on Bull's implied warranty claim.  In all other respects, we will affirm the May 11, 2015 order.

## II.    STATEMENT OF JURISDICTION

The District Court exercised diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332.  We have jurisdiction pursuant to 28 U.S.C. § 1291, because the Court's May 11, 2015 order constituted a final order.[2]

---

[2] The amended complaint alleges that the corporate parties have "a principal place of business" at a particular location.  App. 258 (emphasis added).  28 U.S.C. § 1332(c)(1), however, establishing the criteria for determining a corporation's place of citizenship for diversity of citizenship purposes, provides that a corporation is a citizen of the state in which it is incorporated and is a citizen of the state in which it has "its principal place of business." (Emphasis added).  See Hunt v. Acromed Corp., 961 F.2d 1079, 1080 (3d Cir. 1992).  When we examined the District Court's jurisdiction we noted Bull's defective jurisdictional allegations.  See, e.g., Pomper v. Thompson, 836 F.2d 131, 132 (3d Cir. 1987).  Accordingly, at our direction, the Clerk of this Court by a letter dated January 25, 2016, directed the parties to submit supplemental briefing on the question of "whether the apparent jurisdictional problem raised by the pleading is indeed a problem and, if so, whether and how it might be remedied."  Letter from Marcia M. Waldron, Clerk of the United States Court of Appeals for the Third Circuit (Jan. 25, 2016) (on file with the Court).

In their supplemental briefs, the parties acknowledge that the jurisdictional allegations of the amended complaint are imprecise, though they agree that there is complete diversity of citizenship in this matter.  Notwithstanding this agreement between the parties, we point out that Bull's supplemental brief and supporting documents remain imprecise to the extent that they treat MTD Holdings, Inc. as a defendant in this case.  The cause of this imprecision is that the case caption names MTD Consumer Group, Inc. as a defendant, along with over 40 additional defendants, but does not include MTD Holdings, Inc. as a defendant or otherwise list it in the case caption.  The Declaration of Jeffrey J. Ludwikowski, submitted with Bull's supplemental brief, nonetheless states that MTD Consumer Group, Inc. and MTD Holdings, Inc. are incorporated entities with

5

## III.  STANDARD OF REVIEW

We exercise de novo review over the order granting MTD's Rule 12(b)(6) motions to dismiss.  See Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc., 730 F.3d 263, 268 (3d Cir. 2013); Renfro v. Unisys Corp., 671 F.3d 314, 320 (3d Cir. 2011).  In doing so, we first "take note of the elements a plaintiff must plead to state a claim."  Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (citation and internal quotation marks omitted).  Then, we determine if the claim has facial plausibility, a threshold that can be reached only when a plaintiff pleads factual content— as opposed to mere conclusions—that allows us to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678,

principal places of business, a point seemingly relevant to our assessment of whether there is complete diversity of citizenship in this case.  The Declaration is misguided inasmuch as MTD Holdings, Inc. is not a defendant and therefore its citizenship need not be considered to assess whether there is complete diversity of citizenship.

Relatedly, although the citizenship of each captioned defendant ordinarily must be examined to determine if there is complete diversity of citizenship, Lincoln Prop. Co. v. Roche, 546 U.S. 81, 89, 126 S.Ct. 606, 613 (2005), the amended complaint alleges, and Bull's supplemental brief confirms, that all entities listed as defendants other than MTD Consumer Group, Inc. are merely trade names under which MTD Consumer Group, Inc. "trades and/or does business."  App. 259.  The parties seem to be of the view that these other names, though captioned as defendants, are not relevant to our assessment of whether there is complete diversity of citizenship in this matter.  Nevertheless, in light of Bull's defective jurisdictional allegations, on the remand Bull should seek to amend these allegations pursuant to 28 U.S.C. § 1653, which permits "[d]efective allegations of jurisdiction [to] [] be amended, upon terms, in the trial or appellate courts."  The District Court can then reconsider whether there is complete diversity of citizenship. Notwithstanding the imprecision of the jurisdictional allegations, we are adjudicating this matter on the merits, as it appears that as they now read, the pleadings set forth that there are only two parties that need be considered for jurisdictional purposes–Bull, a citizen of Pennsylvania, and MTD Consumer Group, Inc., a citizen of Ohio–and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6

129 S.Ct. 1937, 1949 (2009).  Although we "must accept the allegations in the complaint as true, we are not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation."  Morrow v. Balaski, 719 F.3d 160, 165 (3d Cir. 2013) (quoting Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007)) (internal quotation marks omitted); James v. City of Wilkes-Barre, 700 F.3d 675, 679 (3d Cir. 2012).  Accordingly, we must examine the context in which Bull made its claims, including the underlying substantive law, in order to assess the plausibility of the claims.  See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 320 n.18 (3d Cir. 2010).

## IV.     BACKGROUND

### A.     Factual History

Dennis Bull founded Bull as Somerville Equipment Company in 1967, but he changed its name to Bull International, Inc. in 1978.  Bull sold and serviced commercial mowing, lawn and garden, and farm and light industrial equipment, at least some of which was manufactured under the Cub Cadet brand.  Though International Harvester originally manufactured and distributed Cub Cadet products, MTD purchased the brand in 1981 and created the Cub Cadet Corporation.

By contracts dated August 1, 1985, Bull and Cub Cadet entered into a Dealer Wholesale Finance Agreement, a Sales and Service Agreement (the "Dealer Agreement"), and an Account Finance Agreement.  As we already have stated, the Agreements do not contain provisions specifying their temporal duration, but the

7

Wholesale Finance and Dealer Agreements provide that either party could terminate the Agreements at "any time" after providing 30 days prior written notice to the other party. See App. 294, ¶ M; App. 298, ¶ M. But as we also already have indicated, we draw the inference from the amended complaint that the relationship between Bull and MTD was amicable for an extended period. In fact, though Bull no longer is in business, it had a strong record in selling Cub Cadet products and MTD repeatedly honored it for being a consistent high-performing dealer. For example, MTD named Bull the Cub Cadet North Region Retailer of the Year in 2010 and Bull was a repeat member of the Cub Cadet Million Dollar Club. In addition, MTD recognized Bull with a 50-Year Partnership Award and invitations to Cub Cadet incentive trips every year since the late 1980s until the termination of the Bull-MTD relationship.

There is no allegation in the amended complaint that Bull and MTD ever modified their written Agreements in further writings. Nevertheless, Bull alleges that two events altered their Agreements. The first event occurred in or around 1991, when, Bull alleges, Curt Moll, owner and then-CEO of MTD, "specifically requested [that] all Cub Cadet dealers . . . be exclusive dealers only for Cub Cadet branded lawn and garden products." App. 264. Moll's exclusivity request—which Bull does not allege was ever put in writing—meant that Bull would not sell lawn and garden products other than those that MTD manufactured. But Bull does not claim that it was barred from selling other types of products made by different manufacturers. Bull asserts that when Moll made this exclusivity request he "impliedly promised" that if Bull became an exclusive dealer for MTD lawn and garden equipment it could remain an MTD dealer indefinitely. App. 264.

8

Based on what Bull claims was Moll's implied promise, it became an exclusive Cub Cadet dealer for all lawn and garden products.

Bull alleges that the second relationship-altering event occurred in 2002, when MTD "began to sell the Cub Cadet brand through big box retailers." App. 261. Bull does not allege that the terms of the Agreements precluded MTD from making this change in the marketing of its products but alleges, instead, that MTD's unilateral change in marketing strategy led to a reduction in Bull's market share of the affected products. Furthermore, Bull alleges that the change forced it to perform more low-margin work (warranty service, for example) while its high-margin business (equipment sales) was diminished. Bull alleges that the change in MTD's marketing strategy expanded the scope of Bull's obligation to service MTD's products because MTD requested that the independent retailers of its products, such as Bull, service MTD's products even if sold by other dealers. Bull alleges that its warranty service obligations became even more problematic "[i]n the past few years," after MTD began to distribute its products through big box retailers because MTD began to obtain various parts and components manufactured offshore, a change that led to a reduction in their quality and availability. App. 262. Bull alleges that Jeff Bull, who became president of Bull after Dennis Bull's death, voiced these concerns to MTD on a regular basis.

Significantly, for over 40 years, Bull was a member of a trade association now known as the Northeast Equipment Dealer Association, Inc. ("NEDA").[3] NEDA's mission is to improve business conditions for equipment dealers in the northeast United States and it traditionally has been active in the legislative process to support its efforts. Jeff Bull served as the president of NEDA in 2007 and 2013, and served as its interim president in late 2012. Bull contends that in this capacity, Jeff Bull was involved in NEDA's efforts to have pro-dealer legislation enacted in Pennsylvania and eight other northeastern states, and alleges that these efforts motivated MTD to end its relationship with Bull.

On September 24, 2013, a law firm representing MTD informed Bull by letter that MTD would terminate its Wholesale Finance and Dealer Agreements after expiration of the 30-day notice period provided in the Agreements. The letter did not state a cause for the termination, and when Bull sought to ascertain the cause, MTD representatives declined to provide an explanation. MTD contended that it did not have to state a cause because the Agreements: (1) did not require it to do so prior to the termination of its Agreements with Bull; and (2) the Agreements called for only 30 days prior written notice of termination to the other party. Bull responded that these contractual terms violated the OEDA, codified in Ohio Rev. Code § 1353.06, because the statute requires a supplier, such as MTD, to show "good cause" and to provide not fewer than "180 days'

---

[3] NEDA, joined by the Ohio-Michigan Equipment Dealers Association, filed an amicus curiae brief in support of Bull. In the brief the amici ask that we reverse the order of the District Court granting MTD's motions to dismiss.

10

prior written notice" before it may terminate its agreements with a dealer.  Id.; App. 268-69.

Specifically, for the "good cause" requirement Bull pointed to Ohio Rev. Code § 1353.06(A)(1) which provides:

> No supplier, without good cause, shall terminate, fail to renew, or substantially alter the competitive circumstances of a dealer agreement that is entered into by the supplier and a dealer on or after the effective date of this section or that is a continuing contract with no expiration date.

For the extended notice requirement, Bull pointed to Ohio Rev. Code § 1353.06(B), which states, in pertinent part:

> Prior to a supplier's termination of or failure to renew a dealer agreement, the supplier shall provide the dealer with not fewer than one hundred eighty days' prior written notice of the intent to terminate or not renew it.

MTD contended, however, and now agues on this appeal, that these provisions of the OEDA are inapplicable because the Ohio legislature enacted them in 2001, more than 15 years after Bull and MTD entered into the Agreements.  MTD contended in the District Court and continues to contend in this Court that the imposition of the OEDA's cause and notice requirements on MTD's termination of its Agreements with Bull would constitute an unconstitutional retroactive application of the law and, accordingly, would substantively impair MTD's vested rights in violation of the United States and Ohio Constitutions.  Thus, notwithstanding Bull's objection, MTD terminated the Agreements after the expiration of the 30-day notice period.

11

Bull alleges that after MTD terminated its Agreements with Bull, MTD "made it known to various other dealers" that Bull was no longer an MTD dealer. App. 266. Bull also alleges that although it had won an invitation to MTD's 2014 dealer incentive trip, MTD informed it that it was disqualified from attending the trip. According to Bull, its absence from the trip was conspicuous and "[a]ll other dealers" in attendance "were aware that no representative of Bull International was present." App. 267.

B.     Procedural History

Bull initiated this action against MTD on February 26, 2014. Bull's initial complaint against MTD contained nine counts alleging claims for breach of contract on several theories, including MTD's failure to comply with the OEDA, failure to act in good faith and to engage in fair dealing, and unconscionability, and non-contractual counts based on promissory estoppel, misrepresentation, defamation, and other tortious conduct. MTD filed a motion to dismiss the complaint, pursuant to Rule 12(b)(6), on April 30, 2014, but, before the District Court ruled on the motion, the Court granted Bull permission to amend the complaint, and Bull filed an amended complaint on October 1, 2014, adding a count for "Breach of Contract (Implied Warranties)." App. 273. On October 29, 2014, MTD filed a motion to dismiss this count as well.

On May 11, 2015, the District Court issued a comprehensive opinion and entered an accompanying order granting MTD's motions to dismiss. The Court first concluded that applying § 1353.06 to the Agreements would violate the Ohio Constitution by retroactively burdening MTD's substantive rights. App. 12. The Court then determined that MTD did not breach an implied covenant of good faith and fair dealing when it

12

terminated the Agreements because the Agreements' express terms allowed their termination. App. 13. The Court next dismissed Bull's claim for "Breach of Contract-Unconscionability" because it reasoned that unconscionability only could be raised as an affirmative defense in a breach of contract action or incorporated into an unjust enrichment claim. App. 14. The Court also held that Bull failed to state a claim for breach of the implied warranties of merchantability and fitness for a particular purpose because: (1) Bull's allegations that MTD's goods were not merchantable were conclusory and general; and (2) Bull failed to assert facts that could support the elements of a breach of the implied warranty for a particular purpose. App. 16-17. The Court also concluded that Bull could not state a claim based on promissory estoppel because Pennsylvania law, which the parties agreed governed the action other than with respect to questions or matters arising under the Agreements,[4] does not recognize a claim based on an implied promise and Bull did not allege that there was an express promise supporting its claims. App. 18-19.

The District Court dismissed Bull's tort-based claims, including the misrepresentation claims, pursuant to the Pennsylvania "gist of the action test" and the "economic loss doctrine" because it viewed the claims as being based on MTD's alleged breach of contract so that, when stated as torts, they duplicated Bull's contract claims

---

[4] The Dealer Agreement states that "[a]ny questions or matters arising under this Contract, as to the validity, construction, performance, or otherwise, shall be determined in accordance with the Laws of the State of Ohio." App. 300. Ohio law therefore governs Bull's claims rooted in breach of contract with respect to the Dealer Agreement. Bull's remaining claims are not subject to this choice of law provision, and the parties agree that Pennsylvania law should be applied to them. See Pac. Emp'rs Ins. Co. v. Global Reinsurance Corp., 693 F.3d 417, 432 (3d Cir. 2012).

against MTD. App. 20-23. Finally, the Court determined that Bull failed to state a claim for defamation based on either: (1) MTD's statements to other dealers that it had terminated its Agreements with Bull; or (2) MTD's disqualification of Bull from attending the 2014 incentive trip. The Court reasoned that MTD's statements that it had terminated Bull were true and thus could not be defamatory, and that MTD's failure to invite Bull to the incentive trip was not a statement at all. App. 25-26. At the end of its opinion and in the accompanying order, the Court dismissed the action with prejudice. Bull timely filed a notice of appeal on June 9, 2015.

## V. DISCUSSION

### A. Breach of Contract

The District Court concluded that the OEDA in Ohio Rev. Code § 1353.06 was inapplicable in the circumstances here because its retroactive application would violate the Ohio Constitution and burden substantive terms of the parties' Agreements reached before the enactment of the law. On appeal, Bull asserts, as it did in the District Court, that the OEDA and its termination provisions are more demanding than those in the Agreements and that the OEDA applies to the Agreements because MTD materially modified the parties' relationship—and formed new contracts—following the enactment of § 1353.06. Bull's theory thus seeks to avoid the retroactivity issue by framing the Agreements as post-enactment contracts that MTD breached by terminating the Agreements without complying with the requirements of the OEDA.

14

MTD provides a layered answer to Bull's contention. It first points to the Agreements' provisions precluding their alteration or modification except by a writing signed by authorized representatives of both parties. According to MTD, these provisions explicitly bar the formation of the purportedly new contracts on which Bull relies. Second, recognizing that not all retroactive applications of a statute violate the United States and Ohio Constitutions, MTD argues that § 1353.06's heightened termination requirements are substantive—as opposed to remedial—and if applied here unconstitutionally would burden its prior vested rights. We are satisfied that Bull's "new contracts" theory lacks merit and that application of § 1353.06's termination requirements to the Agreements would violate the Ohio Constitution. Accordingly, for the reasons we will explain below, we will affirm the District Court's dismissal of Bull's breach of contract claim to the extent the claim is dependent on § 1353.06.

1. Bull's "New Contracts" Theory Based on
Material Alterations to the Parties' Relationship

In support of its contention that § 1353.06 is applicable to the Agreements, Bull asserts that the parties materially altered their relationship on the two occasions we described above. Specifically, Bull claims that the relationship-modifying events were: (1) Bull's promise in 1991 "to sell MTD's products exclusively at the request of MTD"; and (2) MTD's decision in 2002 to sell its products "through 'big box' stores." Appellant's Reply br. at 4-5. According to Bull, these modifications bring the

15

Agreements into the post-§ 1353.06 period and render the retroactivity issue that MTD raises irrelevant.[5]  We cannot agree.

Under Ohio law, it may be possible for contractually bound parties to form a new contract by significantly or materially altering their relationship.  Hal Artz Lincoln-Mercury, Inc. v. Ohio Motor Vehicle Dealers Bd., 693 N.E.2d 811, 816 (Ohio Ct. App. 1997).  In such a case, a determination of whether alterations in the parties' relationship are sufficiently "significant" or "material" to form a new contract would be a question of fact that a factfinder would resolve, id., but "if the materiality question in a given case admits of only one reasonable answer . . . then the court must intervene and address what is ordinarily a fact question as a question of law," Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 92-93 (3d Cir. 2008) (citations omitted).

Bull contends that its decision, at MTD's request, to become an exclusive MTD dealer of lawn and garden products fundamentally altered its relationship with MTD. Bull further contends that MTD's change in its marketing strategy to include "big box" stores as distributors of its products had similar effect.  It argues that these circumstances provide apt examples of fundamental changes in the parties' relationship sufficient to form new contracts.  But Bull's position suffers from several flaws, the first of which

---

[5] The Agreements contain provisions that shed light on why Bull relies on its "new contracts" theory.  Specifically, the documents contain an integration clause, which provides some variation of the following, in pertinent part: "[n]o representative of Cub Cadet other than one of its duly authorized officers has authority to modify, change or waive any of [the Agreement's] terms, conditions and/or provisions.  Any modification must be in writing and signed by the appropriate official of both parties."  App. 77, ¶ X; see also App. 71, ¶ G.  Bull does not allege that the parties modified the 1985 Agreements in accordance with these formal modification procedures.

16

applies only to Bull's agreement to become an exclusive dealer of MTD lawn and garden products. Bull alleges that then-MTD CEO Moll "requested [that] all Cub Cadet dealers . . . be exclusive dealers only for Cub Cadet branded lawn and garden products." App. 264. According to the amended complaint, Moll's request and Bull's subsequent shift to sell only lawn and garden products with the Cub Cadet brand occurred in 1991.

Yet Ohio enacted the provisions of the OEDA in 2001 that Bull argues are applicable as a result of the "new contract" that Bull and MTD formed. Thus, even if we were to conclude that Bull's agreement to become a Cub Cadet dealer on an exclusive basis with respect to lawn and garden products was a sufficiently material change in the parties' relationship so that they should be regarded as entering into a new contract at that time, that new contract would have been effective as of 1991. Bull does not explain how a new contract formed in 1991 possibly could render the later enacted termination provisions of § 1353.06 applicable to the contract unless the 2001 law was applied retroactively. Moreover, Bull does not allege that the parties did not continue to conduct their dealings in accordance with the Agreements' original provisions after the 1991 exclusive dealership change. Thus, we do not understand how the Agreements' termination provisions could have been modified in 1991. Consequently, we will not examine whether Bull's 1991 decision to sell Cub Cadet lawn and garden products on an exclusive basis created a new, post-§ 1353.06 contract.

The other event that Bull asserts materially altered the parties' relationship occurred in 2002, when MTD "began to sell the Cub Cadet brand through big box retailers." App. 261. According to Bull, the change in MTD's marketing strategy led to

17

a reduction in Bull's market share, and forced Bull to perform an increased volume of low-margin work while its high-margin business concurrently declined. Bull does not persuasively explain, however, how MTD's unilateral and independent change in its marketing strategy altered its contractual relationship with Bull. After all, Bull does not point to any provision in its Agreements with MTD prohibiting MTD from marketing its products through "big box" retailers. Furthermore, Bull cannot plausibly assert that MTD's decision to grant third-party retailers permission to sell the Cub Cadet brand—a brand for which Bull was an exclusive dealer solely for lawn and garden products—somehow altered its Agreements with MTD. Moreover, it is unclear how or why Bull distinguishes "big box" retailers from Bull's other competitors to which MTD sells Cub Cadet products, or why a reduction in Bull's lawn and garden product market share materially altered its broader contractual relationship with MTD. We conclude that the materiality determination is "sufficiently lopsided" to require us to "address what is ordinarily a factual question as a question of law." Norfolk S. Ry. Co., 512 F.3d at 92 (citations omitted). Because Bull's theory based on the formation of "new contracts" lacks merit, we address whether it would be constitutional to apply § 1353.06 retroactively.

2.      Retroactively Applying § 1353.06 would Violate
        the Retroactivity Clause of the Ohio Constitution

Because we are satisfied that the Agreements—as executed in 1985—are the contracts relevant to Bull's breach of contract claim, we must evaluate whether the termination provisions of § 1353.06 may be applied retroactively to them. The OEDA in

18

§ 1353.05 provides that the section applies retroactively to any "continuing contract that has no expiration date." As a result, the statute, in terms, applies to the Agreements between Bull and MTD inasmuch as they do not have an expiration date and remained effective after the enactment of the OEDA provisions in 2001. But the Ohio Constitution contains a Retroactivity Clause, Article II, Section 28, providing that the "general assembly shall have no power to pass retroactive laws, or law impairing the obligation of contracts." Thus, despite the clear retroactive language of § 1353.05, the OEDA including the termination provisions in § 1353.06 cannot apply to the Agreements unless their retroactive application would not violate Article II, Section 28 of the Ohio Constitution.

To determine whether a statute violates the Retroactivity Clause, a court must "first determine whether the General Assembly expressly intended the statute to apply retroactively. . . . [and] [i]f so, . . . whether the statute is substantive, rendering it unconstitutionally retroactive, as opposed to merely remedial." Smith v. Smith, 847 N.E.2d 414, 417 (Ohio 2006) (citations, emphasis, and internal quotation marks omitted). Inasmuch as § 1353.05 makes clear that the Ohio Legislature intended the OEDA to apply retroactively, we must determine whether it would violate Article II, Section 28, to apply § 1353.06 retroactively, a determination that turns on whether the statute is substantive or remedial.

Under Ohio law, "[a] substantive statute is one that impairs vested rights, affects an accrued substantive right, or imposes new or additional burdens, duties, obligations, or liabilities as to a past transaction." Smith, 847 N.E.2d at 417 (citations and internal

19

quotation marks omitted); see also Ackison v. Anchor Packing Co., 897 N.E.2d 1118, 1123 (Ohio 2008); State ex rel. Noble v. Indus. Comm'n, 882 N.E.2d 1, 2 (Ohio Ct. App. 2007). In contrast, remedial statutes "affect[] only the remedy provided, and include laws that merely substitute a new or more appropriate remedy for the enforcement of an existing right." Ackison, 897 N.E.2d at 1123.

Although so far as we are aware the Ohio Supreme Court has not opined on whether § 1353.06 is substantive or remedial, other courts have concluded that analogous statutory provisions applicable to automotive dealership agreements limiting a franchisor's right to terminate a franchise are substantive. See, e.g., Coulter Pontiac, Inc. v. Pontiac Motor Div., General Motors Corp., 446 N.E.2d 1128, 1131 (Ohio Ct. App. 1981). For example, in Coulter Pontiac, a manufacturer terminated an automobile dealer's franchise agreement after a complete change in the ownership of the dealer's stock. Id. at 1129. The dealer franchise agreement provided that "[a]ny change in the management of Dealer . . . . without [] prior written approval" would be grounds for termination. Id. However, the appellant pointed to Ohio Rev. Code § 4517.54—which was enacted after the parties entered into the dealer franchise agreement—and claimed that the statute's "good cause" termination requirement applied retroactively to its dealer franchise agreement. Id. at 1130. The court rejected this contention because it reasoned that "[t]he provisions at issue [we]re intended to add the substantive requirement in franchise contracts, covered by the Act, that grounds for termination be limited to those specific reasons set forth by statute." Id. at 1131. Because the legislature attempted in the statute to limit the grounds for termination previously available to a franchisor, the

20

court concluded that the statute was substantive and thus, if applied retroactively, would violate Article II, Section 28. Id.

The Court of Appeals for the Sixth Circuit reached a similar result when considering the constitutionality of a retroactive application of Ohio Rev. Code § 4517 in Bob Tatone Ford, Inc. v. Ford Motor Co., 197 F.3d 787 (6th Cir. 1999). The appellant in Bob Tatone Ford was a franchised automobile dealer that sued the appellee franchisor-manufacturer for wrongful termination of its franchise agreement. Id. at 788. Specifically, the appellant argued that Ohio Rev. Code §§ 4517.54-55, enacted after the parties entered into the franchise agreement, should be applied retroactively to replace the less demanding termination procedures and notice requirements of the franchise agreement. Id. at 790. The court concluded that the statute could not be applied retroactively because it "substantively affected the ability of a franchisor to terminate an agreement." Id. at 791. The court held that the statute's attempt to limit the bases for termination retroactively to "only . . . the grounds defined by the statute" violated Article II, Section 28. Id. at 792 (citing Coulter Pontiac, 446 N.E.2d at 1131).

Finally, in John Deere Constr. & Forestry Co. v. Mahnen Mach., Inc., No. 1:01CV2757, 2005 U.S. Dist. LEXIS 21701, at *10 (N.D. Ohio Sept. 21, 2005) ("John Deere"), a district court in the Northern District of Ohio adopted a magistrate judge's Report and Recommendation which applied the reasoning of Bob Tatone Ford to § 1353.06. In that case, the defendant contended that the franchisor-plaintiff violated § 1353.06 when it terminated the parties' pre-statute dealer agreements without cause. App. 105. The magistrate judge's Report and Recommendation reasoned that:

21

> [t]he agreements at issue, whose creation predates the
> effective date of § 1353.06, expressly gave [the franchisor]
> the right to terminate on notice without cause. The statute, if
> applied in this case, would eliminate [the franchisor's] right
> to so terminate the agreements. That right is a substantive
> right of contract, which the Ohio Constitution protects from
> retroactive impairment.

App. 107. The court adopted the magistrate judge's Report and Recommendation and indicated that § 1353.06—the same statute at issue in this case—was a substantive statute that could not be applied retroactively. John Deere, 2005 U.S. Dist. Lexis 21701, at *10.

In light of these decisions, we conclude that Ohio Rev. Code § 1353.06 is substantive and may not be applied retroactively to the earlier executed Agreements between Bull and MTD. These Agreements allow either party to terminate them after 30 days prior written notice and do not require that the party terminating the Agreements state or even have a cause for doing so. But if we give § 1353.06 retroactive effect, we would: (1) preclude Bull and MTD from terminating the Agreements without good cause; and (2) require them to provide not fewer than 180 days prior written notice of termination to the other party. The statute's heightened termination requirements—written into law more than 15 years after the parties executed the Agreements—would negate MTD's contractual rights that vested in 1985 and impose "additional burdens, duties, obligations, or liabilities" on MTD which the parties did not include in the Agreements. Smith, 847 N.E.2d at 417. Thus, a retroactive application of § 1353.06 would narrow the grounds on which MTD could terminate the Agreements in a manner violating the Ohio Constitution. Bull cannot rely on § 1353.06 to salvage its breach of

22

contract claim, and we therefore will affirm the District Court's dismissal of the claim to the extent based on that section.[6]

B.      Breach of Contract-Implied Covenant of Good Faith and Fair Dealing

The District Court dismissed Bull's breach of contract claim based on MTD's breach of the implied covenant of good faith and fair dealing because it held that when MTD terminated its Agreements with Bull, it complied with the express terms of the Agreements.  MTD asserts that we should uphold this ruling because as a matter of law a party may not base a claim for a breach of the obligation to act in good faith and engage in fair dealing on conduct allowable under a contract—here, termination of the Agreements without cause after 30 days prior written notice.  Bull and the amici, on the other hand, contend that even if the Agreements allowed MTD to terminate its Agreements with Bull, MTD's motivation for doing so was improper and invidious.  Specifically, Bull claims that MTD wrongfully made its decision to terminate the Agreements because of Jeff Bull's lobbying efforts with NEDA, as well as his repeated complaints to MTD about what he believed was the declining quality and availability of MTD's products.

---

[6] MTD also contends that a retroactive application of Ohio Rev. Code § 1353.06 would violate the Contracts Clauses of the United States and Ohio Constitutions.  Appellee's br. at 25-31; see U.S. Const. art. I, § 10, cl. 1 Ohio Const. art. II, § 28.  Although MTD's position may have merit, we need not address it in light of our conclusion that § 1353.06 violates the Retroactivity Clause of the Ohio Constitution.  It is well established that we avoid deciding federal constitutional issues when resolution of such issues is not necessary for the disposition of a case.  See, e.g., In re Snyder, 472 U.S. 634, 642, 105 S.Ct. 2874, 2880 (1985).

Ohio law imposes a duty to act in good faith and engage in fair dealing on the parties to any contract. Wendy's Int'l, Inc. v. Saverin, 337 F. App'x 471, 476 (6th Cir. 2009); Littlejohn v. Parrish, 839 N.E.2d 49, 53 (Ohio Ct. App. 2005). "Good faith is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." Ed Schory & Sons, Inc. v. Soc. Nat'l Bank, 662 N.E.2d 1074, 1082-83 (Ohio 1996) (citation and internal quotation marks omitted). Ohio courts have explained that the duty serves as a construction aid, or a gap-filler, meant to assist in a determination of the parties' intent where a contract is silent on a specific subject. Metro. Life Ins. Co. v. Triskett Illinois, Inc., 646 N.E.2d 528, 534 n.2 (Ohio Ct. App. 1994). Accordingly, the principle that a party must act in good faith does "not block use of terms that actually appear in the contract." Id. (quoting Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1357 (7th Cir. 1990)).

Although at least one federal district court, applying Ohio law, has entertained the possibility that a party can breach the duty to act in good faith if it dishonestly terminates a contract based on "invidious purposes," Florence Urgent Care v. Healthspan, Inc., 445 F. Supp. 2d 871, 880 (S.D. Ohio 2006), a party does not fail to exercise good faith "by acting as allowed by the specific terms of the contract," Wendy's Int'l, 337 F. App'x at 477; Ed Schory & Sons, 662 N.E.2d at 1083. As the Supreme Court of Ohio has explained, "[f]irms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of good faith." Ed Schory & Sons, 662 N.E.2d at 1082 (citation and internal

24

quotation marks omitted); see also In re Kaplan, 143 F.3d 807, 818 (3d Cir. 1998)

("[E]xpress covenants abrogate the operation of implied [covenants] so courts will not permit implied agreements to overrule or modify the express contract of the parties.").

Bull's claim for breach of the duty to act in good faith turns on its contention that MTD terminated the Agreements in retaliation for Jeff Bull's trade-group advocacy and his complaints concerning the quality and availability of MTD's products. Specifically, Bull alleges that MTD terminated the Agreements in retaliation for Jeff Bull's: (1) involvement in NEDA and his efforts to obtain dealer-friendly state legislation, App. 270, ¶ 93a; (2) "repeated articulation of concerns over declining quality of MTD products," App. 270, ¶ 93b; (3) "repeated articulation of concerns over declining safety of MTD products," App. 270, ¶ 93c; (4) "repeated articulation of concerns over [the] unavailability of product from MTD necessary to fulfill customer demands," App. 270, ¶ 93d; (5) "repeated articulation of concerns related to the unavailability of service parts and unacceptable delivery delays of parts necessary to service customer requirements," App. 270, ¶ 93e; and (6) "repeated articulation of concerns over the continued viability of the [independent retailer] network due to loss of market share and MTD's imposed lower profit margins," App. 270, ¶ 93f. In sum, Bull claims that MTD targeted Bull because Jeff Bull sought the enactment of dealer-friendly legislation and advocated for improvement of MTD's performance under the Agreements.

But, notwithstanding Bull's assertions, which for all we know may be well founded, MTD had the contractual right to terminate the Agreements without cause or explanation. MTD simply exercised that right, and, in so doing, did not violate its duties

25

with respect to good faith and fair dealing. Indeed, the law in a case on which Bull relies to support its lack of good faith claim, Florence Urgent Care, supports a conclusion that MTD did not violate its duty to act in good faith and deal fairly when it terminated the Agreements. In Florence Urgent Care, the plaintiffs-physicians brought a claim based, inter alia, on an alleged breach of the covenant of good faith and fair dealing against a medical preferred provider network. 455 F. Supp. 2d at 873-75. The plaintiffs alleged that although the defendants claimed that they terminated the plaintiffs from their network because of the plaintiffs' improper billing practices, the defendants really terminated the relationship because of the plaintiffs' Middle Eastern ancestry. Id. Both parties moved for summary judgment on the claim. The defendants argued on the motions that they were entitled to judgment as a matter of law "because the [agreement] provide[d] for termination by notice, and [applicable] Ohio law allows parties to exercise rights under a contract without being liable for such a breach." Id. at 878-79.

The Florence Urgent Care court denied summary judgment to both parties on the good faith and fair dealing issues as it reasoned that the case "present[ed] more than a mere termination without cause, but rather present[ed] a case where a jury could find pretext for invidious purposes running contrary to public policy," i.e., prejudicial reasons, even though the defendants asserted that they were terminating the plaintiffs from the defendant's network by reason of the plaintiffs' improper billing practices. Id. at 880 (emphasis added) (citation and internal quotation marks omitted). The court confined its ruling to the facts of the case "under which the alleged violator admittedly lied about the purported reason for its" decision to terminate the plaintiffs, and it was "the lack of

26

honesty . . . [that] preclude[d] a finding in Defendants' favor on their summary judgment motions." Id. at 879, 880.

Even if Florence Urgent Care were controlling state precedent, however, Bull's allegations with respect to MTD do not fit the above description because Bull does not contend that MTD was dishonest about its reasons for terminating its Agreements with Bull. Indeed, Bull alleges quite the opposite: that MTD refused to provide a reason for its termination decision and asserted that it had a contractual right to terminate its Agreements with Bull without cause. Thus, rather than asserting that MTD provided pretextual or improper reasons for its termination of its Agreements with Bull, Bull alleges that MTD provided no reason for the termination. Therefore, according to Bull's own allegations, the termination was literally "without cause." Id. at 880.

But the Agreements between Bull and MTD allowed either party to terminate the Agreements after 30 days prior written notice and made no reference to the need for a cause for the termination.[7] Though Bull regards this provision as unfair to it, Bull

---

[7] Bull contends that it could have demonstrated that MTD acted for the retaliatory reasons that we have described if it had been given the opportunity for discovery. The problem with this argument is that in the absence of a dealer protection law such as the OEDA, there is no reason why MTD could not have terminated its Agreements with Bull because it objected to Jeff Bull's conduct. Certainly the First Amendment would not have precluded Bull from doing so. See Democratic Nat'l Comm. v. Republican Nat'l Comm., 673 F.3d 192, 204 (3d Cir. 2012) ("[T]he First Amendment applies only to state action.") (citing Cent. Hardware Co. v. NLRB, 407 U.S. 539, 547, 92 S.Ct. 2238, 2243 (1972)). Moreover, we see no way that a case seeking damages for the termination because of Jeff Bull's legislative efforts and complaints regarding MTD's procedures based on common law principles would be viable. Indeed, the absence of a basis for a common law dealer or franchisee action based on a supplier's termination of a dealer's or franchisee's contract with the manufacturer or franchisor has led many states to enact dealer and franchisee protection laws such as the OEDA. In this regard, Bull indicates that in "the

27

overlooks the circumstance that it could have terminated its relationship with MTD if it found what it regarded as a better supplier of the products that MTD supplied or, indeed, for any other reason. Moreover, the integration clauses in the Agreements explain, in pertinent part, that "all understandings and agreements with respect to the subject matter hereof between the parties are contained in this Contract." App. 300; see also App. 294. In these circumstances, Bull cannot rely on a claim that MTD breached its duty to act in good faith and to engage in fair dealing to negate the express terms of the Agreements. MTD exercised a right that the Agreements expressly provided and the District Court properly dismissed Bull's claims as they cannot be reconciled with MTD's exercise of that right.

C.      Breach of Contract-Unconscionability

The District Court dismissed Bull's claim that the Dealer Agreement was unconscionable because the Court concluded that unconscionability is an affirmative defense not available as an independent cause of action. This is an accurate statement of the law, as there is general agreement among courts applying Ohio law that unconscionability only may "be raised as an affirmative defense to a breach of contract action or incorporated into an unjust enrichment claim." Price v. EquiFirst Corp., No. 1:08-CV-1860, 2009 WL 917950, at *7 (N.D. Ohio Apr. 1, 2009) (citation omitted); see also Cook v. Home Depot U.S.A., Inc., 2007 WL 710220, at *5 (S.D. Ohio Mar. 6, 2007) (summarizing cases). Thus, despite Bull's attempt to repackage its claim based on

past 25 years . . . approximately 35 states" have enacted dealer protection laws. Appellant's br. at 21.

28

unconscionability as one based on "unenforceability," we will dismiss the claim for the reasons the District Court set forth. App. 13-14.[8]

D.      Breach of Contract-Implied Warranties

Bull asserted a claim against MTD for breach of the implied warranties of merchantability and fitness for a particular purpose based on MTD's allegedly deficient manufacturing of several of its products. See App. 273. The District Court dismissed this claim with prejudice because it determined that: (1) Bull's factual averments were insufficient to support the elements of a cause of action for breach of the implied warranty of fitness for a particular purpose; and (2) allegations that Bull made about full product-line failures were too conclusory and general to state a claim for breach of the implied warranty of merchantability regarding a specific MTD product. On appeal, Bull contends that it was not obligated "to identify by serial number each and every product in the subject series that was defective," Appellant's Reply br. at 11, and that "the only logical inference" to draw from the amended complaint is that the MTD products it identified as being defective, and thus as not satisfying the implied warranties

---

[8] As we have explained, Bull cannot maintain an independent claim for breach of contract based on unconscionability. Even if such a claim was available to it, Bull's amended complaint fails to set forth sufficiently either procedural or substantive unconscionability. Bull distributed MTD's products under the Dealer Agreement for more than 25 years, and its allegations fail to assert sufficiently that it lacked "meaningful choice" or agreed to "contract terms that are unreasonably favorable to" MTD. W. Res. Acad. v. Franklin, 999 N.E.2d 1198, 1200 (Ohio Ct. App. 2013). Moreover, when Bull entered into its Agreements with MTD allowing either party to terminate the Agreements and did not include conditions on the exercise of that right, it should have recognized that the Agreements were subject to termination without cause and if it could not have negotiated for what it regarded as better termination provisions it was free not to enter into the Agreements.

29

accompanying the products, could not be sold "without issue" as "Bull's customers would not spend thousands of dollars on products that did not work and posed safety concerns." Id. at 11-12.

Ohio law, applicable on the warranty claims, codifies an implied warranty of merchantability and an implied warranty of fitness for a particular purpose at Ohio Rev. Code § 1302.27 and § 1302.28, respectively. The implied warranty of fitness for a particular purpose applies "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, . . . ." Ohio Rev. Code § 1302.28 (emphasis added). The Commentary in the code to the section establishing the warranty explains that for the warranty to apply, "the buyer . . . must actually be relying on the seller," id., Comment 1, and the "particular purpose" must "differ[] from the ordinary purpose for which the goods are used," id., Comment 2; see also Hollingsworth v. Software House, Inc., 513 N.E.2d 1372, 1376 (Ohio Ct. App. 1986).

When we examine the allegations of the amended complaint, we, like the District Court, find that Bull has failed to allege even the basic elements of a claim for breach of the implied warranty of fitness for a particular purpose as defined in § 1302.28. Indeed, Bull does not aver that it relied on MTD's skill or knowledge to select or furnish the Cub Cadet products listed in the amended complaint. Furthermore, Bull neither sets forth a particular purpose for which the Cub Cadet products were to be used nor asserts that

30

MTD knew of any particular purpose for the products' use.[9]  In light of Bull's insufficient allegations, we need not address its claim for breach of the implied warranty of fitness for a particular purpose any further.[10]

In contrast, Bull's allegations that MTD breached the implied warranty of merchantability are sufficient to survive MTD's motion to dismiss.  Ohio Rev. Code § 1302.27(A) states:  "[u]nless excluded or modified as provided in section 1302.29 of the Revised Code, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  Section 1302.27(B) specifically explains that, to be merchantable, goods must at least: (1) "pass without objection in the trade under the contract description"; (2) be "of fair average

---

[9] The closest that Bull comes to alleging a particular purpose for which MTD's products were to be used is its assertion that the products were "use[d] in the terrain of Western Pennsylvania."  App. 275, ¶ 117.  As an initial matter, it is unclear how the use of lawn and garden equipment on the terrain of the region in which a dealer is located constitutes a particular (as distinguished from an ordinary) purpose.  See Ohio Rev. Code § 1302.28, Comment 2.  But even if using lawn and garden equipment on the terrain of Western Pennsylvania constituted a particular purpose, Bull does not allege that it relied on MTD's knowledge or skill in selecting the relevant equipment.

[10] In dismissing Bull's claim for breach of the implied warranty of fitness for a particular purpose, the District Court stated: "[m]oreover, the parts that Bull contends failed hardly seem to be major components that would affect the fitness of MTD tractors for the ordinary purpose for which they were used."  App. 16.  Bull argues that in reaching this conclusion the District Court engaged in improper fact finding.  Appellant's br. at 17-18.  We agree with Bull that the District Court—without any record or basis for its opinion at the motion to dismiss stage—should not have passed on the importance or functional significance of the allegedly defective lawn tractor parts.  Though we recognize that under Ashcroft v. Iqbal, a reviewing court is entitled to "draw on its judicial experience and common sense" in determining whether a complaint states a plausible claim for relief, 556 U.S. at 679, 129 S.Ct. at 1950, we do not understand how judicial experience or common sense could have aided the District Court in its assessment of the significance of the allegedly deficient tractor parts that Bull listed.  At least we know that we could not make that assessment.

31

quality within the description"; (3) be "fit for the ordinary purposes for which such goods are used"; (4) "run, within the variations permitted by the agreement, of even kind, quality and quantity, within each unit and among all units involved"; (5) be "adequately contained, packaged, and labeled as the agreement may require"; and (6) "conform to the promises or affirmations of fact made on the container or label if any." Ohio Rev. Code § 1302.27(B)(1)-(6). It is significant that neither Ohio law nor the Uniform Commercial Code limits the right to bring an action based on breach of the implied warranty of merchantability to an ultimate consumer. Consequently, a dealer such as Bull may bring a claim for its breach as between the dealer and the supplying manufacturer provided that the manufacturer is a merchant within Ohio Rev. Code § 1302.01(A) (5). See Allis-Chalmers Credit Corp. v. Herbolt, 479 N.E.2d 293, 297 (Ohio Ct. App. 1984); see also Mar. Mfrs., Inc. v. Hi-Skipper Marina, 483 N.E.2d 144, 146 (Ohio 1985); cf. Harbourview Yacht Sales, L.L.C. v. Ocean Yachts, Inc., 500 F. Supp. 2d 462, 466-67 (D.N.J. 2007).

The District Court dismissed Bull's claim based on its reasoning that Bull failed to "state specifically" how MTD did not comply with the standard in International Organization for Standardization 9001:2008,[11] or how the allegedly defective parts that Bull listed affected the merchantability of MTD's products. App. 16. To support its conclusion, the Court incorrectly indicated that Bull "mention[ed] none of the six (6)

---

[11] According to Bull, an Organization for Standardization 9001:2008 compliance indication on a product operates as an industry guarantee that the product is "safe, reliable and of good quality." App. 274, ¶ 111.

criteria of merchantability listed in § 1302.27 (B)." Id. This statement is puzzling, however, because Bull does set forth the six criteria of merchantability in paragraph 107 of the amended complaint, essentially tracking § 1302.27(B).[12] App. 273-74. Moreover, following Bull's recitation of § 1302.27(B)'s requirements, Bull provides significant and detailed factual allegations that, when taken as true, call the merchantability of MTD's products into question.

The factual allegations that support Bull's claim for breach of the implied warranty of merchantability focus on MTD's use of five types of parts in "various" models that are "either not merchantable and/or fit for particular purpose of use." App. 275, ¶ 117. Bull avers that "[s]ince before at least 2006," it has advised MTD that it had concerns about the quality and safety of its products. App. 275, ¶ 116. Specifically, Bull alleges that the following five parts are not "merchantable and/or fit for particular purpose": (1) plastic hood on Cub Cadet models 2500 Series tractors; (2) steel wheel rim on various Cub Cadet models; (3) steel seat base on Cub Cadet models 2500 Series tractors; (4) small steel hub on Cub Cadet models 3000 Series; and (5) large steel hub on Cub Cadet model 3000 Series. App. 275, ¶ 117(a)-(e). Bull further asserts that laboratory testing on these five parts has demonstrated that MTD is not compliant with its International Organization for Standardization 9001:2008 certification, and it provides detailed summaries of the laboratory's findings regarding each allegedly defective part.

---

[12] In its brief, MTD claims that "Bull did not allege any of the required elements under Ohio law showing the products were not merchantable." Appellee's br. at 12. Nevertheless, Bull clearly stated a claim for breach of the implied warranty of merchantability under Ohio law.

Furthermore, Bull alleges that MTD did not recall parts it knew were defective and did not issue any service advisory to warn dealers and consumers of the parts' potential of failure. Finally, Bull alleges that it has received numerous complaints and requests for warranty service relating to each of the five defective parts, and the complaints and service requests have "forced [it] to spend hundreds of hours servicing under warranty failed MTD products." App. 276, ¶ 122(a)-(e) to 277, ¶ 124.

We are satisfied that these factual allegations include enough factual "heft" to "nudge[] [Bull's] claims across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 594, 557, 570, 127 S.Ct. 1955, 1966, 1974 (2007). If we take Bull's factual allegations as true and view them in the light most favorable to Bull, as we must on this appeal from an order granting a motion to dismiss, see Morrow, 719 F.3d at 165, they sufficiently assert that various MTD products were: (1) defectively fabricated; (2) of substandard quality; (3) improperly labeled and described; and (4) unfit for their ordinary purposes. Bull's allegations about the results of laboratory testing further support the allegation that certain MTD products were unsafe and not merchantable, at least to an extent sufficient to survive a Rule 12(b)(6) motion.

In resisting this conclusion, MTD contends that Bull was bound by the same warranties that it granted to the users of MTD's products. MTD points to a limited warranty given to users of its products which it attached as an exhibit to its memorandum in support of its motion to dismiss Bull's claim, and accurately notes that the limited warranty conspicuously states as follows: "[t]here are no implied warranties, including without limitation any implied warranty of merchantability . . . ." See App. 312; 316.

34

MTD is correct that in the limited warranty it expressly disclaimed any implied warranty of merchantability in bold type, but MTD is mistaken to the extent that it argues that we properly may consider extraneous documents at the motion to dismiss stage. As we have explained, "[i]n evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, . . . and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (alteration in original) (citations and internal quotation marks omitted).

The warranty with the disclaimer that MTD attached as an exhibit does not come within any one of the above categories, and, though it may prove to be important if MTD moves for summary judgment on remand or at a trial, we will not consider the disclaimer in evaluating the appeal from an order granting MTD's Rule 12(b)(6) motion. Without consideration of the disclaimer, and in light of our above analysis, the Court erred when it dismissed Bull's claim for breach of the implied warranty of merchantability. Accordingly, we will reverse the order of the District Court to the extent that it dismissed the claim for breach of the warranty of merchantability and will remand the case to that Court for further proceedings on this claim.

E.      Promissory Estoppel

The District Court dismissed Bull's promissory estoppel claim because it determined that, under Pennsylvania law,[13] such a claim must be based on an express promise. Bull contends that then-MTD CEO Moll "impliedly promised that the relationship between [MTD and Bull] would continue indefinitely," Appellant's br. at 38, and further contends that its allegations are sufficient to state a claim for promissory estoppel.

Promissory estoppel is an equitable doctrine that may be invoked to enforce a promise that one party makes to another even in the absence of an enforceable agreement between the parties. Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000). In order to assert a claim for promissory estoppel under Pennsylvania law the aggrieved party must show that:

> (1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise.

Id. Importantly, Pennsylvania law requires that a litigant base a claim for promissory estoppel on an express promise, rather than a "broad and vague implied promise." C & K Petroleum Prods., Inc. v. Equibank, 839 F.2d 188, 192 (3d Cir. 1988); see also Constar, Inc. v. Nat'l Distribution Ctr., Inc., 101 F. Supp. 2d 319, 324 (E.D. Pa. 2000) (applying Pennsylvania law).

---

[13] The parties agree that Pennsylvania law applies to Bull's promissory estoppel claim and its remaining tort-based claims. These claims do not involve questions or matters under the Agreements and therefore are not subject to the Ohio choice of law clause in the Agreements. See App. 18 n.7; Appellant's br. at 37.

The promissory estoppel allegations of Bull's amended complaint, however, are based on a broad and vague implied promise. As the District Court explained, Bull predicates its promissory estoppel claim on Bull's allegation that, in or around 1991, Moll "impliedly promised" that MTD and Bull would continue to do business indefinitely when Bull became an exclusive Cub Cadet dealer with respect to lawn and garden products. App. 278, ¶ 128. Bull further asserts that MTD breached Moll's implied promise in 2013, when it terminated its Agreements with Bull without cause. But in the absence of any allegation that Moll made an express promise to Bull leading to its detrimental reliance, Bull does not adequately state a claim based on promissory estoppel. Consequently, we will affirm the District Court's dismissal of this claim.[14]

F.     Gist of the Action Doctrine - Bull's Tortious Interference Claims

The District Court dismissed Counts VIII, IX, and X—all different iterations of a tortious interference claim[15]—under the gist of the action doctrine, recognized by the Pennsylvania courts, because it determined that Bull's tort-based claims were derivative

---

[14] In dicta, the District Court stated: "[m]oreover, the Court questions whether it was reasonable [for Bull] to rely upon a vague, implied promise of a contractual relationship in perpetuity in the face of the express terms of the contract which allowed termination, without cause, upon thirty (30) days written notice." App. 18-19. Nevertheless, it is clear that the Court did not rely on this statement in reaching its result. Rather, the Court dismissed Bull's promissory estoppel claim "[b]ecause an implied promise is insufficient to sustain a contract claim based on promissory estoppel." App. 19. Inasmuch as we agree with the Court's analysis and can affirm "on any basis which finds support in the record," Fairview Twp. v. EPA, 773 F.2d 517, 525 n.15 (3d Cir. 1985), we will not disturb its dismissal of Bull's promissory estoppel claim.

[15] These claims allege tortious interference with existing contracts (Count VIII), tortious interference with business relationships (Count IX), and tortious interference with prospective economic advantage (Count X).

37

of its contract-based claims and its alleged injuries were dependent on MTD's wrongful termination of the Agreements. On appeal, Bull maintains that the District Court's conclusion fails as a matter of logic, because "[i]t makes no sense that the District Court could conclude that MTD breached no terms of its contractual relationship with Bull, and then also conclude that the gist of the action doctrine precludes tort claims based on what are properly considered breach of contract claims." Appellant's br. at 41. According to Bull, its tort-based claims are separate "in conduct and nature" from its contract-based claims, and therefore the gist of the action doctrine does not bar its action. Appellant's br. at 41; Appellant's Reply br. 21.

We apply Pennsylvania law when considering the effect of the gist of the action doctrine on these tortious interference claims. Pennsylvania courts apply the gist of the action doctrine "to ensure that a party does not bring a tort claim for what is, in actuality, a claim for a breach of contract." Bruno v. Erie Ins. Co., 106 A.3d 48, 60 (Pa. 2014). Under the doctrine, a party is precluded from pursuing a tort action for the breach of contractual duties in the absence of any separate or independent event giving rise to the tort. See Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 103 (3d Cir. 2001) (applying Pennsylvania law). The purpose of the doctrine is thus "to maintain the conceptual distinction between breach of contract claims and tort claims." eToll, Inc. v. Elias/Savion Advert., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002).

As we have explained, "[t]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." Bohler-

38

Uddeholm Am., 247 F.3d at 103-04 (citation omitted).  Said another way, "a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts." Id. at 104 (citation and internal quotation marks omitted).

With these principles in mind, Pennsylvania courts and other persuasive authority interpreting Pennsylvania law have catalogued the types of claims that the gist of the action doctrine bars.  The gist of the action doctrine precludes claims: (1) "arising solely from a contract between the parties"; (2) where "the duties allegedly breached were created and grounded in the contract itself"; (3) where "the liability stems from a contract"; or (4) where the tort claim "essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract."  eToll, 811 A.2d at 19 (citations omitted).  From this list, it is clear that Bull's tortious interference claims will be precluded if they rely on MTD's termination of the Agreements or conduct that is subject to an express contractual provision within the Agreements.  It is also clear, despite Bull's arguments to the contrary, that Bull cannot revive its dismissed contract-based claims by repackaging them in the form of torts.

When we examine Bull's claims for tortious interference alleged in the amended complaint, we conclude that Bull bases them on MTD's "wrongful termination" of its Agreements with Bull.  The first is Count VIII of the amended complaint, Bull's claim for tortious interference with contract, which alleges, in pertinent part:

> 160.  By wrongfully terminating Bull International's Dealer Agreement with MTD, MTD has rendered performance of

> Bull International's contractual obligations to its various customers impossible.
>
> 161.   Bull intended to prevent Bull International from performing the contractual obligations to its various customers.
>
> 162.   <u>As a result of MTD's wrongful termination of Bull International it has tortiously interfered</u> with Bull International's contractual relationships with its various customers who purchased MTD products.

App. 283, ¶¶ 160-62 (emphasis added).  The second claim is Count IX, Bull's claim for tortious interference with business relationships, which alleges, in pertinent part:

> 165.   Over the course of the past 50 years, Bull International has established ongoing business relationships with several of its customers.
>
> 166.   MTD knew of the relationships that Bull International had established with its customers.
>
> 167.   <u>As a result of MTD's wrongful termination of Bull International it has tortiously interfered</u> with Bull International's business relationship with its various customers.

App. 284, ¶¶ 165-67 (emphasis added).  The final claim is Count X, Bull's claim for tortious interference with prospective economic advantage, which alleges, in pertinent part:

> 170.   Bull International has an existing reasonable expectation of future economic benefit arising from its established relationships with its customer base.
>
> 171.   MTD knew of the relationships that Bull International had established with its customer base.
>
> 172.   <u>As a result of MTD's intentional wrongful termination of Bull International it has tortiously interfered</u> with Bull

40

> International's reasonable expectation of future economic advantage.
>
> 173. Bull International would have received the anticipated economic benefit arising from its established relationships with customers in the absence of MTD's interference.

App. 285, ¶¶ 170-73 (emphasis added).

Each of Bull's tortious interference claims thus follows the same basic formula: a legal conclusion (e.g., MTD tortiously interfered) added to the allegation that MTD wrongfully terminated its relationship with Bull. Under this formulation, the volitional conduct alleged is MTD's allegedly wrongful termination of its Agreements with Bull, not MTD's "breach of duties imposed as a matter of social policy" or duties "embodied in the law of torts." Bohler-Uddeholm Am., 247 F.3d at 103-04 (citation omitted). Indeed, Bull does not allege any tortious conduct by MTD—or any event attributable to MTD—that is independent of MTD's termination of its relationship with Bull. Thus, these claims cannot be characterized properly as separate or distinct from the claims derived out of the parties' contractual obligations under the Agreements. Rather, "the nature of the duty alleged to have been breached, as established by the underlying averments supporting [Bull's] claim," Bruno, 106 A.3d at 68, is contractual and turns on whether MTD had the right to terminate its Agreements with Bull.

Moreover, Bull's tortious interference claims fit squarely within the eToll court's list of tort claim-types that the gist of the action doctrine precludes. Although Bull's claims could be precluded under several of the claim-types listed, the final category is most applicable to this case. Under that category, the gist of the action doctrine precludes

41

tort claims where the claim "essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." eToll, 811 A.2d at 19 (citations omitted). Returning to Bull's allegations, each tortious interference claim hinges on "MTD's wrongful termination of Bull International." E.g., App. 284, ¶ 167. As a result, Bull's tort allegations are "wholly dependent" on MTD's termination of the Agreements with Bull being wrongful, which, in turn, is wholly dependent on the terms of the Agreements. Bull's contention that the Agreements are collateral to its tort claims therefore contradicts its allegations in the amended complaint.

In an attempt to salvage its claims, Bull argues that its tortious interference claims do not duplicate its contract-based claims because "the contract is unsurprisingly [] silent on whether MTD is prohibited from making statements about Bull or tortiously interfering with Bull's relationships" with customers. Appellant's Reply br. at 21. First, we point out that none of Bull's tortious interference claims mention MTD making statements to Bull's customers—such allegations are confined to Bull's claims for intentional and negligent misrepresentation and defamation, respectively. As we set forth above, Bull's only allegation of MTD's wrongdoing in each of its tortious interference claims concerns MTD's "wrongful termination" of its Agreements with Bull. Second, Bull's argument that MTD's supposed tortious interference is not addressed under the Agreements fails because it relies on Bull's legal conclusion that MTD has tortiously interfered in the first place, which again, is based on Bull's assertion that MTD wrongfully terminated its Agreements with Bull. In sum, the Agreements, as well as Bull's allegation that MTD wrongfully terminated the Agreements, are central to each of

42

Bull's tortious interference claims. Consequently, these claims duplicate Bull's breach of contract claims and the gist of the action doctrine bars the claims.

G.    Economic Loss Doctrine-Bull's Claim for
      Intentional and Negligent Misrepresentation

The District Court, applying Pennsylvania law, relied on the economic loss doctrine to dismiss Bull's claim for intentional and negligent misrepresentation which Bull based on an allegation that MTD "published its termination of Bull International . . . to various dealers and customers." App. 281, ¶ 151. Although the Court set forth the parameters of the economic loss doctrine in detail, it did not undertake an analysis of Bull's claim under the doctrine or explain why dismissal was appropriate. Rather, the Court simply stated that other courts have applied the doctrine to bar both negligent misrepresentation and intentional fraud claims, and that it therefore would dismiss Bull's claim. App. 23.

Although we question the District Court's treatment of the economic loss doctrine, we are "free to affirm the judgment of the district court on any basis which finds support in the record." United States v. Woods, 321 F.3d 361, 364 n.2 (3d Cir. 2003) (citation omitted). For the reasons that follow, we conclude that Bull's claim of intentional and negligent misrepresentation fails to state a claim on which relief can be granted, and thus affirm the dismissal of that claim on that alternate basis.

In Pennsylvania, a party claiming intentional misrepresentation must show:

> (1) a representation; (2) which is material to the transaction at
> hand; (3) made falsely, with knowledge of its falsity or
> recklessness as to whether it is true or false; (4) with the
> intent of misleading another into relying on it; (5) justifiable

43

reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994). The only difference in elements for a claim of negligent as distinguished from intentional misrepresentation is that the false representation can be made in circumstances in which the person making the misrepresentation should have known that the representation was false, rather than where he had knowledge or acted with reckless disregard of the falsity of the representation. Id. at 890.

Against this backdrop, it is clear that Bull's allegations do not state a claim for intentional and negligent misrepresentation. According to Bull's own allegations, the only purported "statement" on which Bull's misrepresentation claim can be predicated is MTD's "publish[ing of] its termination of the Dealership Agreement with Bull International." App. 281, ¶ 149. But Bull does not allege that this supposed "statement" was "made falsely," as required by Pennsylvania law. Quite the opposite, Bull asserts throughout the amended complaint that MTD did, in fact, terminate the Dealer Agreement, as that circumstance is at the heart of its breach-of-contract claims. (E.g., App. 266, ¶ 64; App. 268, ¶ 84). In addition, Bull fails to make any allegation relevant to the reliance element required by Pennsylvania law, among other substantive deficiencies.

Our review of the amended complaint makes clear that Bull's allegations on this claim are based on MTD's termination of the Dealer Agreement. These allegations seek to develop a theory of MTD's "impute[d]" representations being "implicitly published" to others, not Bull's own reliance on a false representation that MTD made to it. App.

44

281-82, ¶¶ 149, 151, 152. Bull does not plead, among other requirements, that MTD made a false representation to it, that it relied on said representation, or that its reliance proximately caused it injury. Rather, the underlying allegations resemble those that might support a claim for defamation. Thus, although we express doubt as to the District Court's dismissal of Bull's intentional and negligent misrepresentation claim pursuant to the economic loss doctrine, nevertheless Bull has failed to state a claim on which relief can be granted. Accordingly, we will affirm the District Court's dismissal of this claim.

H.     Defamation

Finally, Bull contends that the District Court wrongly dismissed its defamation claim because its amended complaint stated a claim under Pennsylvania law for the tort of defamation by implication.[16] In Pennsylvania, "a claim for defamation may exist where the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo."[17] Mzamane v. Winfrey, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010). As the Pennsylvania Supreme Court has explained:

---

[16] Pennsylvania courts also have referred to defamation by implication as "defamation by innuendo," and we will use the terms interchangeably.

[17] There is a Pennsylvania statute defining the elements of a defamation claim. In order to establish a claim for defamation successfully, a plaintiff must prove: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; (7) abuse of a conditionally privileged occasion. 42 Pa. Cons. Stat. § 8343(a). A court decides as a matter of law whether the statements at issue are capable of defamatory meaning. Blackwell v. Eskin, 916 A.2d 1123, 1125 (Pa. Super. Ct. 2007).

The purpose of an innuendo, as is well understood, is to define the defamatory meaning which the plaintiff attaches to the words; to show how they come to have that meaning and how they relate to the plaintiff[.] But it cannot be used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear[.] It is the duty of the court in all cases to determine whether the language used in the objectionable article could fairly and reasonably be construed to have the meaning imputed in the innuendo. If the words are not susceptible of the meaning ascribed to them by the plaintiff and do not sustain the innuendo, the case should not be sent to a jury. . . . [Consequently,] [i]f the publication complained of is not in fact libelous, it cannot be made so by an innuendo which puts an unfair and forced construction on the interpretation of the publication.

Sarkees v. Warner-W. Corp., 37 A.2d 544, 546 (Pa. 1944) (citations and internal quotation marks omitted).

A communication will not be regarded as defamatory by innuendo unless the "innuendo [] [is] warranted, justified and supported by the publication." Livingston v. Murray, 612 A.2d 443, 449 (Pa. Super. Ct. 1992) (citation omitted). But "the literal accuracy of separate statements will not render a communication 'true' where . . . the implication of the communication as a whole was false." Mzamane, 693 F. Supp. 2d at 478 (citation omitted). Thus, "even where the complained-of statements are literally true, if, when viewed in toto, the accurate statements create a false implication, the speaker may be liable for creating a defamatory implication." Id. (emphasis in original).

Here, we can separate Bull's claim for defamation into two potentially defamatory statements: (1) when MTD published the fact that it terminated its Agreements with Bull; and (2) when MTD "implicitly" published such termination by failing to invite Bull to the 2014 Top 100 dealer incentive meeting. App. 25. Specifically, Bull alleges that:

46

137. MTD intentionally and without just cause terminated its Dealer Agreement with Bull International.

138. MTD published its termination of Bull International to various dealers and customers of Bull International.

139. MTD implicitly published its termination of Bull International by preventing Bull International from attending the 2014 Top 100 Dealer Incentive Meeting.

140. MTD knew or should have known that by publishing its termination of its Dealer Agreement with Bull International, it would impute to the listener the implication that Bull International was no longer financially responsible.

App. 280, ¶¶ 137-140 (emphasis added). To assess Bull's claim for defamation-by-innuendo, we must determine whether an alleged inference of Bull's financial irresponsibility would have been "warranted, justified and supported" by MTD's actual communication. Livingston, 612 A.2d at 449 (citation omitted). Said another way, we must evaluate whether third parties "could fairly and reasonably . . . construe[ ]" MTD's termination of its relationship with Bull to mean that Bull was financially irresponsible. Sarkees, 37 A.2d at 546.

As to MTD's first allegedly defamatory communication—publishing its termination of its relationship with Bull—we believe that the strained innuendo for which Bull advocates is not reasonable. If a trier of fact could conclude that a party implied that another party with whom it had a contractual relationship was financially irresponsible simply by terminating their contract, any party that terminated a contract with another party would risk being subject to a defamation claim. The fact that MTD terminated its Agreements with Bull does not justify drawing an inference that Bull is financially

47

unstable because the termination in itself says nothing about the reason for the termination. In the context of a dealer agreement, the act of termination does not operate as a proxy statement that the terminated party is financially irresponsible and Bull's allegations provide no contextual basis beyond the termination itself to justify this connection. After all, there can be any number of reasons for a party's decision to terminate its contractual relationship with another party. Indeed, in this very case, Bull contends that MTD terminated the agreements in retaliation for Jeff Bull's dealer advocacy conduct and his complaints with respect to MTD's products. Neither of these reasons deals with Bull's financial condition.

The second alleged communication that Bull alleges was defamatory is MTD's failure to invite Bull to the 2014 Top 100 dealer incentive meeting. Bull asserts that by not allowing it to attend the meeting, MTD implicitly made a publication that Bull's Agreements with MTD had been terminated, and the fact of termination supported the innuendo that Bull was financially unstable. We recognize that it is well established that a defamatory communication need not be a written or oral statement, Bennett v. Norban, 151 A.2d 476, 478 (Pa. 1959), and "words, gestures or a combination of both may constitute a defamatory communication" under Pennsylvania law, Byars v. Sch. Dist. of Phila., 942 F. Supp. 2d 552, 564 (E.D. Pa. 2013) (citation omitted). But Bull does not allege that MTD's "implicit publication" was any form or combination of words or gestures. Rather, Bull alleges that MTD failed to allow it to attend an event. Even if MTD's action in not allowing Bull to attend the event could communicate the circumstance that its Agreements with Bull had been terminated, however, as we already

48

have indicated, the alleged publication of MTD's termination of the Agreements was not defamatory. Thus, Bull has failed to show that MTD made a defamatory statement, and we will affirm the District Court's dismissal of Bull's defamation claim.[18]

## VI.  CONCLUSION

For the foregoing reasons, we will affirm the District Court's order of May 11, 2015, dismissing Bull's breach of contract, breach of the implied covenant of good faith and fair dealing, unconscionability, promissory estoppel, intentional and negligent misrepresentations, defamation, and various tortious interference claims (Counts I-III, V-X).  However, we will reverse the District Court's order of May 11, 2015, to the extent that it dismissed Bull's breach of contract based on breach of the implied warranty of merchantability claim (Count IV) and will remand the case to the District Court so that Bull can proceed on that claim as allowed in this opinion.  The parties will bear their own costs on this appeal.

---

[18] Even if we agreed with Bull that MTD's statement was defamatory, we would conclude that Bull has failed to state a claim for defamation on account of other pleading deficiencies.  For example, Bull alleges only that MTD's defamatory communications were published to "various dealers and customers of Bull International."  App. 280, ¶ 138.  But as Pennsylvania courts have explained, "[a] complaint for defamation must, on its face, identify exactly to whom the allegedly defamatory statements were made." Jaindl v. Mohr, 637 A.2d 1353, 1358 (Pa. Super. Ct. 1994), aff'd, 661 A.2d 1362 (Pa. 1995).